_____

Nos. 95-1456 and 95-2356
_____

| | | |
|---|---|---|
| William Alpern and Russell D. Miller, on behalf of themselves and all others similarly situated, | * * * * * | Appeal from the United States |
| | * | District Court for the |
| Appellants, | * | Western District of Missouri. |
| | * | |
| v. | * | |
| | * | |
| UtiliCorp United, Inc., | * | |
| | * | |
| Appellee. | * | |

_____

Submitted:    December 11, 1995

Filed:    May 17, 1996
_____

Before MAGILL, GOODWIN[*], and MURPHY, Circuit Judges.
_____


MURPHY, Circuit Judge.


    William D. Alpern and Russell D. Miller filed this securities fraud suit against UtiliCorp United Inc. (UtiliCorp) on behalf of themselves and similarly situated stock purchasers.  Employees of a second-tier subsidiary of UtiliCorp reportedly misappropriated some twenty-one million dollars beginning in September 1990.  The misappropriations were not publicly revealed by UtiliCorp until June 1992, along with a $11.6 million charge against its second-quarter earnings and an anticipated $5.2 million loss. Alpern and Miller claim that UtiliCorp knew or should have known of the

_____

[*]The HONORABLE ALFRED T. GOODWIN, United States Circuit Judge for the Ninth Circuit, sitting by designation.

material misappropriations by at least November 1991, when it commenced its internal investigation, and that certain financial statements made prior to its June 1992 disclosure were misleading. In a series of orders, the district court declined to certify a class, dismissed all claims, and denied two motions for reconsideration. Alpern and Miller now appeal from the judgment entered in the district court and from the order denying their motions for reconsideration. We affirm in part, reverse in part, and remand.

## I.

UtiliCorp is a public utility company which wholly owns a subsidiary called Aquila Energy Corporation (Aquila Omaha), located in Omaha, Nebraska. Aquila Omaha in turn owns a subsidiary named Aquila Energy Resources Corporation (Aquila), formed in 1989 to acquire oil and gas reserves and gathering and processing systems. Aquila is headquartered in Omaha and has an office in Houston, Texas.

Appellants Alpern and Miller sued as holders of UtiliCorp common stock. Russell Miller purchased 200 shares on the open market on November 13, 1991. William Alpern made open market purchases for approximately two years before joining UtiliCorp's Dividend Reinvestment and Stock Purchase Plan (the DRIP plan). This plan allows participants to reinvest cash dividend payments from their common stock at a price discounted from the market price. Alpern reinvested his dividends in return for more shares seven times between September 12, 1990 and March 12, 1992.[2] He asserts he made these investment decisions based on a September 4, 1990 prospectus about the DRIP plan, incorporated by UtiliCorp's

---

[2]Alpern purchased shares of UtiliCorp stock at the discounted DRIP price on September 12, 1990, December 12, 1990, March 12, 1991, June 12, 1991, September 12, 1991, December 12, 1991, and March 12, 1992.

August 14, 1990 registration statement, and on subsequent financial updates from the company on September 12, 1990, December 12, 1990, March 12, 1991, June 12, 1991, September 12, 1991, December 12, 1991, and March 12, 1992.

Appellants contend that two Aquila officers, Vincent F. Marquez, Jr. and Richard D. Stegall, embezzled company funds from September 1, 1990 until they were fired in early 1992. During this time, Marquez served as vice president of Aquila in Houston and as a member of Aquila's board of directors. Richard D. Stegall was Aquila's vice president in charge of acquisitions and a member of its board of directors.

UtiliCorp acquired Aquila Omaha in 1986, and the latter's rapid growth led to internal control problems and reported employee misconduct. In June 1988, an Aquila Omaha employee named Lyn Maddox wrote a memorandum to Marc Petersen, president of both Aquila Omaha and Aquila, stating that investments lacked complete documentation and required better management. Maddox was fired a month later. In an exit interview on July 28, 1988, with UtiliCorp's chairman and chief executive officer, Richard Green, Maddox and Green discussed these internal control problems and an alleged kick-back scheme on an Aquila Omaha project. Petersen had fired the four employees allegedly involved, but Maddox told Green that Petersen had instructed him to keep quiet about the incident.

On October 29, 1991, long after Maddox had been fired, he again informed UtiliCorp management about reported kickbacks and bidrigging, this time occurring at Aquila's offices in Houston. Maddox said his information came from a UtiliCorp shareholder named Jim Walzel. UtiliCorp also learned that a former Aquila employee named Sheila McDonald could have further related information and that Vince Marquez could have been a silent partner in a Houston company that had done business with Aquila.

3

UtiliCorp immediately hired a private investigative firm named Risk Prevention Group, Inc. (RPG). RPG talked with Walzel on November 1, 1991, and with his source, Jim Sheeler, on November 6. Sheeler, an off-shore services company owner who had previously submitted an unsuccessful bid for an Aquila project, had been told that someone had overheard Marquez telling another bidder that "If I get my condo, you get the bid" (the bidder reportedly agreed). In addition, Sheeler had noted that Marquez had recently paid for an extravagant wedding and reception in Hawaii.

Upon receiving this information, UtiliCorp CEO Richard Green met on November 11 with Gail Hudek, a partner at Blackwell Sanders Matheny Weary & Lombardi L.C. (Blackwell), UtiliCorp's long-time outside law firm and counsel for it in the case before the court. Green told Hudek to talk with Aquila president Marc Petersen, and she interviewed him on November 22. Petersen did not believe that Marquez was involved in inappropriate activity and speculated that Sheila McDonald was the possible source of the information. Efforts to contact McDonald continued throughout December; she was finally located in Houston and interviewed by Hudek on January 8, 1992.

According to McDonald, "Marquez was engaged in self-dealing on a large scale, including the receipts of kickbacks on operations contracts and property acquisitions." She described in detail how Marquez obtained authority from Aquila to purchase a property based on an inflated report of the oil and gas reserves it held, used a middleman to negotiate a lower price with the seller, and then split the difference with the middleman between the purchase price and the approved price. McDonald estimated that the losses ranged between thirty and ninety million dollars and had grossly inflated the real value of Aquila's assets.

After Hudek informed Green and other UtiliCorp management on January 13, 1992 of McDonald's disclosures, UtiliCorp greatly

4

expanded the scope and size of its investigation. Benjamin Mann, a Blackwell partner, headed the investigative team comprised of several Blackwell attorneys, Arthur Andersen accountants, and UtiliCorp officers. They interviewed current and former Aquila employees and reviewed thousands of documents. UtiliCorp's investigators discovered further evidence of wrongdoing during the next few weeks. Sometime before January 20, 1992, Lynn Marquez, a former wife of Vince Marquez, produced several cancelled checks totalling approximately $90,000, made out to Vincent Marquez and signed by a principal in several companies that had done business with Aquila Houston. Mann concluded that these checks constituted evidence of a kickback to Vincent Marquez. Arthur Andersen also informed UtiliCorp on January 27, 1992, that the vice president in charge of Houston operations, or someone immediately below him, had transferred large amounts of money without clear authorization.

Blackwell submitted a written report of its findings to UtiliCorp on January 22, 1992. It concluded that "significant evidence of wrongdoing and irregularities" by Marquez clearly provided UtiliCorp management with a sufficient legal basis to terminate him. Moreover, it advised that the evidence was "so strongly indicative of not merely irregular but illegal conduct that [UtiliCorp] management is nearly compelled or obligated, based on its fiduciary responsibility to the Company and its shareholders, to terminate Marquez." Blackwell similarly concluded that discharge of Aquila president Marc Petersen would be legally justified based on his significant management deficiencies, especially given his prior management problems. UtiliCorp fired Marquez two days later and reprimanded Petersen.[3]

Blackwell updated its findings in a January 29, 1992 report. It again stated that there was "substantial circumstantial

---

[3]Petersen was relieved of his duties in February 1992 and fired in December 1992.

evidence" indicating that Marquez was receiving kickbacks, including numerous irregularities regarding middlemen and lack of documentation. Blackwell estimated that the amount of kickbacks could range up to four to five million dollars, but noted that company accountants and outside auditors did not believe this amount needed to be reported.

In the meantime, during the fall and winter, UtiliCorp conducted four public offerings and issued numerous financial statements of record earnings and growth. Five million shares of UtiliCorp common stock were sold at $26 per share on October 29, 1991. Two days later, UtiliCorp announced that third quarter financial results exceeded those from the previous year and that continued growth was expected. Approximately $150 million of unsecured senior notes were sold at a coupon rate of nine percent on November 19, 1991.

December and early January public statements similarly emphasized UtiliCorp's strong financial status. UtiliCorp's press release on December 19, 1991 predicted "record financial results for both the fourth quarter and 1991" and also noted Aquila's dramatic growth. Richard Green proclaimed UtiliCorp's performance to be "another milestone," attributing the success to the company's growth strategy. On January 3, 1992, UtiliCorp estimated that fourth quarter net income for 1991 would be up $4.5 million from the same period the previous year.

On January 22, 1992, UtiliCorp began its third public offering, issuing $130 million of senior notes due January 15, 2007, priced to yield 8.20%. On January 30, 1992, UtiliCorp announced that its 1991 net income had increased 25% to $73.5 million, which Green stated, "further demonstrates the soundness of UtiliCorp's growth strategy which calls for reducing risk through expansion. . . ." Aquila's 1991 growth was also reported in conjunction with its continued strategic acquisitions. This

statement was made about the same time that UtiliCorp filed a registration statement with the SEC relating to a fourth public offering of up to $25 million in preferred stock which was completed in February 1992.

By March 11, 1992, UtiliCorp's investigation team had reported the estimated loss to be between eight and eleven million dollars. At the same time, UtiliCorp's financial report on March 18 continued to report record earnings for 1991, noting it was the ninth consecutive year of record net income and attributing part of its success to Aquila. A similar report was filed on May 13. UtiliCorp did not publicly disclose its investigation or any misappropriation until June 15, 1992.

## II.

Alpern filed his first complaint on June 17, 1992, two days after UtiliCorp's public disclosure. He alleged, on behalf of a class of UtiliCorp common stock purchasers during the period from January 30 through June 15, 1992, that UtiliCorp had violated § 10(b) of the 1934 Securities Act, 15 U.S.C. § 78j, and Rule 10b-5, by fraudulently concealing adverse material information in order to maintain inflated stock prices. After the June 1992 announcement, UtiliCorp stock declined from $28.13 per share on June 12, to $23.63 on June 15, and then to $22.88 on June 16.

On August 6, 1992, Alpern filed an amended complaint which enlarged the class period for the § 10(b) and Rule 10b-5 claims to include September 1, 1990 through June 15, 1992. He also added a claim under § 11 of the 1933 Securities Act, 15 U.S.C. § 77k, on behalf of a subclass of persons who purchased UtiliCorp common stock through its DRIP plan based on UtiliCorp's September 4, 1990 prospectus and its financial updates on one or more of the following dates: September 12, 1990, December 12, 1990, March 12, 1991, June 12, 1991, September 12, 1991, December 12, 1991, and

7

March 12, 1992.

The district court dismissed the first complaint on July 20, 1993, for failure to plead scienter with particularity, as required by Fed.R.Civ.P. 9(b). The complaint was reinstated on November 3, however, after appellants filed a motion for relief from the judgment based on newly discovered evidence suggesting that UtiliCorp knew about the misappropriations four months prior to its public disclosure.[4] The court granted the motion, stating that Alpern "should be given an opportunity to make use of the discovery process to support the allegation of scienter."

Alpern and Miller then filed a second amended complaint on December 6, 1993. Count I alleged the § 11 claim, and Count II alleged the § 10(b) and Rule 10b-5 claims. On March 30, 1994, they moved to certify the § 10(b) and Rule 10b-5 class and the § 11 subclass.

On May 9, 1994, UtiliCorp moved for dismissal or summary judgment on the § 11 claim, for summary judgment on Miller's § 10(b) and Rule 10b-5 claim, and for partial summary judgment on Alpern's § 10(b) and Rule 10b-5 claims. (The motion sought dismissal of Alpern's claim for affirmative misstatements, but not his claim for material omissions.) The parties discussed a possible settlement during the next few months, but the district

---

[4]This evidence consisted of documents indicating knowledge as early as February 1992. On an insurance claim form, dated July 27, 1992, UtiliCorp noted a potential claim against its crime policies based on kickbacks to employees. Its manager of administration wrote on the form that knowledge of the misappropriation "first came to me" on February 12, 1992, although the form also states that UtiliCorp discovered the misappropriations on May 15, 1992. Minutes from a February 4, 1992 meeting of UtiliCorp's audit committee reflected that the director of internal audit reported that UtiliCorp was investigating a situation at Aquila "involv[ing] a senior employee who was dismissed for inappropriate dealings when purchasing reserves for Aquila Energy."

court denied their joint motion for a pre-trial conference to further these negotiations and suspend briefing. Alpern and Miller subsequently submitted their suggestions in opposition to UtiliCorp's motion for summary judgment on July 22.

On August 23, 1994, UtiliCorp's counsel notified appellants that further information relating to the misappropriation was available and that certain depositions needed to be rescheduled. The parties then moved jointly to extend the end of discovery from September 30 to October 31; the motion was granted.

On October 31, UtiliCorp moved for summary judgment on Alpern's remaining § 10(b) and Rule 10b-5 claim for omissions. It argued that it had relied in good faith on its legal and financial advisors that disclosure was not required prior to June 15, 1992, and that scienter therefore did not exist prior to Alpern's last stock purchase on March 12, 1992.

Two weeks after the revised discovery deadline, on November 14, 1994, the district court issued two orders. The first dealt with the motion for dismissal or summary judgment filed in May. The court granted summary judgment on Miller's claim on the ground that the earliest date the evidence could establish UtiliCorp's scienter was December 1991,[5] and Miller had purchased his stock before then, on November 13, 1991. Summary judgment was also granted on Alpern's claim for affirmative misrepresentations because he had not shown any misstatements between December 1991

---

[5]A June 19, 1992 Kansas City Star newspaper article had reported that UtiliCorp knew of "the problems at the [UtiliCorp] subsidiary" in December 1991. The other evidence in the record pertaining to scienter consisted of the February 4, 1992 minutes of a UtiliCorp Audit Committee meeting; the July 27, 1992 insurance claim form stating that UtiliCorp's Manager of Administration first learned about the misappropriation on February 12, 1992; Marquez's discharge date of January 24, 1992; and Stegall's discharge date of February 24, 1992.

and his last stock purchase in March 1992.  Finally, the court granted summary judgment on Alpern's § 11 claim.  Since Alpern's highest purchase price was less than the stock's value on the date he added this claim (August 6, 1992), the court concluded that he had suffered no § 11 damages. As a result of this order, only Alpern's § 10(b) and Rule 10b-5 claim for material omissions remained in the case.

A companion order denied the motion for class certification because most of the § 10(b) and Rule 10b-5 claims and the § 11 claim had been dismissed, and Alpern's remaining claim for material omissions was said to be atypical of claims by a class of open market purchasers.

The next day, UtiliCorp offered Alpern $368.36 as payment for the stock he had purchased on March 12, 1992.  Alpern refused to accept payment because of his fiduciary duty to the proposed class.  On November 22, 1994, UtiliCorp moved to dismiss as moot the remaining § 10(b) and Rule 10b-5 claim for omissions, arguing that its tendered offer represented the maximum amount of relief Alpern could recover.  The district court agreed and ordered payment delivered to the clerk of the court in satisfaction of Alpern's claim.

The case was closed in the district court pursuant to an order for judgment issued on January 6, 1995.  This order incorporated the November 14, 1994 orders, granted UtiliCorp's motion to dismiss the case pursuant to Fed.R.Civ.P.12(b)(1), and denied as moot its motion for summary judgment as to Alpern's omissions claim.

Meanwhile, on November 28, 1994, shortly after the November 14 orders for summary judgment and denial of class certification, Miller and Alpern had filed two motions for reconsideration.  Miller sought reinstatement of his § 10(b) and Rule 10b-5 claim

pursuant to Rule 60(b)(2),[6] claiming that newly discovered evidence indicated UtiliCorp had scienter prior to his November 1991 stock purchase. Alpern sought reinstatement of his affirmative misstatements claim pursuant to Rule 60(a)[7] and Rule 60(b)(2), claiming that a typographical error in the complaint was the basis on which partial summary judgment had been granted and that there now was sufficient evidence to withstand that motion. Miller and Alpern also sought to vacate the order denying class certification. They maintained that their claims had been improperly dismissed on summary judgment and that Alpern's § 10(b) and Rule 10b-5 claim was typical of the claims of open market purchasers.

The district court denied both motions in a single order issued on April 17, 1995. The court rejected consideration of the appellants' evidence that allegedly established UtiliCorp's scienter prior to stock purchases by Miller and Alpern on the basis that it was not newly discovered within the meaning of Rule 60(b)(2). It also refused to permit correction of the typographical error in the second amended complaint, which alleged misstatements by UtiliCorp in its announcement of record results in a statement of January 1991, instead of in January 1992. The court concluded that Rule 60(a) relief was not required because identification of the correct date of the announcement would not affect the issue of scienter, and because UtiliCorp's tendered offer had satisfied Alpern's damage claim. Without discussion, the court also denied the motion for relief from its order denying class certification.

---

[6]Rule 60(b)(2) provides for relief from a final judgment based on "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)." Fed.R.Civ.P. 60(b)(2).

[7]Rule 60(a) provides that "[c]lerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders." Fed.R.Civ.P. 60(a).

11

Alpern and Miller filed two appeals, which are both before the court, one from the January 6, 1995 judgment entered against them, and another from the April 17, 1995 denial of their motions for reconsideration.  They claim that they should have been permitted to represent the class, that there were issues of material fact precluding summary judgment, and that they were entitled to relief under Rule 60.

### III.

In Count II, Alpern and Miller alleged violations of § 10(b) of the 1934 Securities Act, 15 U.S.C. § 78j, and Rule 10b-5.  They claimed that they, and the class they sought to represent, had detrimentally relied on UtiliCorp's reckless or knowingly false statements or omissions of material facts concerning the misappropriations, which artificially inflated the market price of its stock throughout the class period.

Congress enacted the 1934 Act in order to promote full disclosure and thereby protect investors against manipulation of stock prices.  See Basic Inc. v. Levinson, 485 U.S. 224, 230 (1988).  "There cannot be honest markets without honest publicity.  Manipulation and dishonest practices of the market place thrive upon mystery and secrecy."  Id. (citation omitted). Section 10(b) specifically prohibits the use of any "manipulative or deceptive device or contrivance" in connection with the purchase or sale of a security.  15 U.S.C. § 78j(b); Herman & MacLean v. Huddleston, 459 U.S. 375, 382 (1983).

Rule 10b-5, promulgated by the Securities and Exchange Commission under its § 10(b) authority, provides that it is unlawful "for any person, directly or indirectly,"

(a) To employ any device, scheme, or artifice to defraud,

12

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in the connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (1995).

Standing under § 10(b) and Rule 10b-5 requires a showing of (1) misrepresentations or omissions of material fact or acts that operated as a fraud or deceit; (2) causation, often analyzed in terms of materiality and reliance; (3) damages; and (4) fraudulent activity occurring in connection with the purchase and sale of a security. 17 C.F.R. § 240.10b-5; Harris v. Union Elec. Co., 787 F.2d 355, 362 (8th Cir.), cert. den., 479 U.S. 823 (1986). A fact is material if it is substantially likely "that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic Inc., 435 U.S. at 231-32 (citation omitted); see also Harris, 787 F.2d at 366. This determination requires assessment of the inferences a reasonable shareholder "would draw from a given set of facts and the significance of those inferences to him." TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 450 (1976).

Scienter is not explicitly required by the statutory text, but it is an acknowledged essential element of a § 10(b) or Rule 10b-5 claim. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976); Harris, 787 F.2d at 362. Scienter may be established by proof of knowing or intentional practices to deceive, manipulate, or defraud. Harris, 787 F.2d at 362. Negligence is not sufficient, Hochfelder, 425 U.S. at 215, but this circuit follows the majority rule that recklessness also satisfies the scienter requirement.

Van Dyke v. Coburn Enterprises, Inc., 873 F.2d 1094, 1100 (8th Cir. 1989). If the defendants "stated untrue facts with reckless disregard for their truth or falsity," there is scienter.  Id.

**A.**

The timing of UtiliCorp's disclosures and the date when scienter might be established are key issues in this case, and related discovery is of importance in its procedural history.

UtiliCorp's initial set of discovery answers did not reveal when it learned of Marquez's alleged kickback scheme or began its internal investigation.  In response to appellants' first request for documents on December 29, 1993, UtiliCorp produced some eighty boxes of materials for copying in March 1994.  Among these documents turned over in March were two requests for greater autonomy from Marc Petersen, Aquila's president, to CEO Green in 1990, and minutes from two UtiliCorp Audit Committee meetings in April and May of 1991, at which Price Waterhouse reported internal control problems at the Aquila branches.

On May 9, 1994, UtiliCorp moved for summary judgment on all claims except for Alpern's § 10(b) and Rule 10b-5 omissions claim.  Throughout the next few months, the parties concentrated on extensive settlement negotiations.  They jointly moved on June 23 for a pretrial conference and to postpone all briefing until after the conference.  After the court denied the motion, appellants filed their suggestions in opposition to UtiliCorp's summary judgment motion on July 22.

Appellants finished reviewing the documents obtained in March sometime in August 1994, and scheduled depositions of Richard Green and Harry L. Winn, Jr., UtiliCorp's chief financial officer, for the second week of September.  They also served document requests and subpoenas on UtiliCorp's director of internal audit, David A.

14

Sisel; the former chairman of UtiliCorp's audit committee, Harry Winn; and UtiliCorp's lead investigator at Arthur Andersen, Barbara Buganier, and Benjamin Mann at Blackwell. On August 23, 1994, UtiliCorp informed appellants that the September depositions would have to be rescheduled. It also promised to disclose by the following week materials about its internal investigation of embezzlement at Aquila and some Arthur Andersen documents. Based on this unexpected turn of events, at the parties' joint request, the district court extended discovery from September 30 until October 31.

UtiliCorp's promised disclosures did not occur until September 9 and October 6. On these dates it produced thousands of documents. These documents disclosed for the first time that UtiliCorp had hired a private investigation firm and contacted Blackwell attorneys in early November 1991 to investigate the kickback allegations against Marquez. Appellants also now discovered Blackwell's January 22, 1992 memorandum to UtiliCorp, written by Benjamin Mann and two other attorneys, advising that Marquez be discharged due to his illegal conduct, Arthur Andersen's January 27, 1992 letter to UtiliCorp discussing large and possibly unauthorized wire transfers at Aquila in Houston, and Lyn Maddox's 1988 discussions with Richard Green about Aquila's internal control problems and alleged kickback scheme in the Omaha office.

Appellants began the process of sorting through these documents, and during October 1994 they deposed several members of UtiliCorp's investigation team. Depositions were taken of Benjamin Mann, the lead investigator at Blackwell, on October 12; David Sisel, UtiliCorp's director of internal audit, on October 18; Harry Winn, UtiliCorp's chief financial officer, on October 27; and Barbara J. Buganier, a partner and certified fraud examiner at Arthur Andersen, on October 28. Miller also served his first interrogatories to UtiliCorp on October 28.

15

None of the information disclosed during this second wave of discovery or in the October depositions was before the district court when it issued its summary judgment order on November 14, 1994, two weeks after discovery had been scheduled to end.[8]  The court based its understanding of the case upon UtiliCorp's stated version of the facts.  Appellants had failed to include in their opposition to the motion a list of disputed material facts as required by Local Rule 13(G), and the court indicated it would consider only those facts which had support in the record.  The only documents pertaining to scienter in the record at that time were those which had prompted the reinstatement of Alpern's complaint on December 6, 1993.  The summary judgment decision was therefore based entirely on evidence produced before the scheduled discovery period began.

Two weeks after issuance of the summary judgment order, appellants filed a motion for reconsideration.  They attached documents obtained through discovery which they claimed established UtiliCorp's scienter prior to Miller's stock purchase on November 13, 1991 and Alpern's purchase in March 1992.  The district court declined to reconsider its order granting summary judgment on the grounds that the evidence presented in the motion was not newly discovered within the meaning of Rule 60(b)(2).

The court also denied Alpern relief under Rule 60(a) even though it recognized the existence of a typographical error in the complaint, which had referred to January 30, 1991, instead of 1992, as the date of a key UtiliCorp financial statement.  Correction would have been irrelevant, it reasoned, because the correction could not have made a difference in the earliest scienter date given the nature of the record at the time summary judgment was

_____

[8]This deadline had been set in August 1994, prior to the production of thousands of documents by UtiliCorp in September and October 1994.

granted. In addition, the court concluded that Alpern could not recover damages for his March 1992 purchase because UtiliCorp had already tendered a check to the court for that purchase upon the court's dismissal of Alpern's omissions claim.

**B.**

A party is entitled to relief under Rule 60(b)(2) from an order of summary judgment where (1) the evidence was discovered after the summary judgment hearing; (2) the moving party exercised due diligence to discover the evidence; (3) the evidence is material and not merely cumulative or impeaching; and (4) a new hearing considering the evidence would probably produce a different result. Callanan v. Runyun, 75 F.3d 1293, 1297 (8th Cir. 1996). The district court determined that Alpern and Miller failed to meet the first and second criteria (although there had been no summary judgment hearing). It noted that appellants had obtained the evidence before the court issued its summary judgment order, and concluded that UtiliCorp's allegedly untimely production of the documents did not excuse the appellants' lack of due diligence in locating the evidence. We review the district court's denial of a Rule 60(b) motion for abuse of discretion. Id.

A party must have a justifiable excuse for timely failing to oppose a motion for summary judgment if it had sufficient opportunity to submit the evidence prior to a ruling on the motion. See Love v. Commerce Bank of St. Louis, N.A., 37 F.3d 1295, 1296 (8th Cir. 1994). Here, appellants concede that they possessed the new documents a few weeks prior to the summary judgment order, but they argue that they lacked sufficient time to analyze and submit the evidence.

UtiliCorp did not disclose several of these documents until some four months after it had filed for summary judgment and about two months after appellants had filed their opposition to the

17

summary judgment motion.  UtiliCorp had filed its motion for summary judgment in May 1994, and appellants responded in July 1994.  UtiliCorp waited until September and October 1994, however, before producing some key documents pertaining to its investigation of the misappropriations.  These materials, which appellants attached to their motion for reconsideration, disclosed that UtiliCorp's investigation began in early November 1991, instead of in January 1992, as appellants had been previously led to believe.  Also buried among the thousands of documents produced at this time were Blackwell's January 22, 1992 memorandum advising Marquez's termination and Arthur Andersen's January 27, 1992 letter concerning large and possibly unauthorized wire transfers at Aquila Houston.  Both of these documents were also submitted with the motion for reconsideration.

Not only were appellants sorting through and analyzing these materials turned over at this late date, but they were also conducting depositions throughout October based on the new discovery.  For example, they deposed Benjamin Mann, Blackwell's lead investigator and an author of the January 22, 1992 memo, on October 12; David A. Sisel, UtiliCorp's director of internal audit, on October 18; and Barbara Buganier, Arthur Andersen's head partner on the investigation team, on October 28.

Appellants also attached to the motion for reconsideration certain documents produced by UtiliCorp in March 1994, the relevance of which became clearer as a result of the October disclosures.  These included two 1990 memoranda from Aquila president Marc Peterson to UtiliCorp CEO Richard Green, asking for greater management authority.  Appellants further included minutes from two 1991 UtiliCorp Audit Committee meetings, at which Price Waterhouse reported that internal control problems and a record keeping deficiency at Aquila were being addressed by additional qualified staff.  Appellants argue that because Green knew about these problems, he knew or should have known as of late October

18

1991 that the allegations against Marquez were of a serious nature.

Appellants were collating all of this information when UtiliCorp filed, on October 31, 1994, a second motion for summary judgment as to Alpern's remaining omissions claim. Appellants were planning to present a single submission of the evidence to the district court on the pending motions when the order granting UtiliCorp's first motion for summary judgment was issued, just two weeks after the close of the scheduled discovery period.

The timing of UtiliCorp's disclosures about its internal investigation and its results impeded appellants' ability to process and present the information prior to the court's ruling. It also undercut the purpose of discovery, which is to enable parties to obtain the factual information needed to prepare their cases for disposition. As the district court recognized earlier in the litigation, unearthing proof of scienter was especially difficult in this case because direct evidence had to come primarily from UtiliCorp. See, e.g., Costello, Porter, Hill, Heisterkamp & Bushnell v. Providers Fidelity Life Ins. Co., 958 F.2d 836, 838-39 (8th Cir. 1992) (greater latitude permissible where information needed to respond to summary judgment motion is likely to be in movant's sole possession); Xerox Corp. v. Genmoora Corp., 888 F.2d 345, 354 (5th Cir. 1989) (discovery essential because shareholder's proof of wrongdoing must come entirely from the defendant ex-directors); Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 756 F.2d 230, 236 (2nd Cir. 1985) (discovery rules should be applied liberally so litigant may secure helpful evidence from adversary).

Under the circumstances here, UtiliCorp's delayed disclosures should not be viewed as a lack of due diligence on the part of appellants, thereby precluding consideration of this evidence under Rule 60(b)(2). Since appellants have presented a justifiable excuse for not submitting the evidence prior to the summary

19

judgment ruling, they are entitled to relief if the evidence is material, not merely cumulative or impeaching, and would probably produce a different result.  See Love, 37 F.3d at 1296; Callanan, 75 F.3d at 1297.

As discussed above, the evidence submitted on reconsideration revealed for the first time when and how UtiliCorp learned about the allegations of wrongdoing by Marquez, the timing and scope of its subsequent investigation, and when and what information it discovered as a result.  This evidence is material both for the appellants' case on the issue of scienter and for UtiliCorp's defense of good faith reliance on its legal and financial advisors about when public disclosure became necessary.

The final factor is whether consideration of this evidence at a new hearing on UtiliCorp's motion for summary judgment would probably produce a different result.  See Callanan, 75 F.3d at 1297.  Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).

With respect to Miller's claim, the district court determined that there was no genuine issue of material fact as to whether UtiliCorp had scienter in regard to the misappropriations at Aquila Houston prior to his sole stock purchase on November 13, 1991.  Miller asserts that the following new evidence shows that UtiliCorp had the requisite scienter: UtiliCorp's knowledge in 1988 that four employees had been fired for an alleged kickback scheme at Aquila's Omaha branch; attempts by Aquila's president to gain greater management authority in 1990; reported internal control problems at the Aquila subsidiaries in spring of 1991; an October 31, 1991 telephone report from a former Aquila Omaha employee fired three years previously, that he had heard of kickbacks and

20

bidrigging at Aquila's Houston office; UtiliCorp's hiring of a private group to investigate the rumor; an unverified proposition by Marquez to an unknown bidder; and Marquez's reportedly expensive wedding trip to Hawaii.

Thus, the most specific evidence UtiliCorp received about the misappropriations prior to Miller's stock purchase was that a former bidder had been told that someone else had overheard Marquez proposition another bidder. In order to satisfy the requirement of materiality, it must be substantially likely that a reasonable investor would have viewed the disclosure of the omitted fact as having significantly altered the total mix of information made available. Basic Inc., 485 U.S. at 231-32. This standard is not met with respect to the information known to UtiliCorp at that time. Nor is it probable that UtiliCorp then had the requisite scienter intentionally or recklessly to deceive, manipulate, or defraud shareholders through its financial statements. See Harris, 787 F.2d at 362; Van Dyke, 873 F.2d at 1100. Accordingly, even if the district court had reconsidered its ruling in light of appellants' new evidence, it would have probably not produced a different result. The district court therefore did not abuse its discretion in denying Miller Rule 60(b)(2) relief from its order granting summary judgment as to his § 10(b) and Rule 10b-5 claim. See Callanan, 75 F.3d at 1297.

The situation differs as to Alpern, however. The district court had granted summary judgment as to Alpern's § 10(b) and Rule 10b-5 affirmative misstatements claim because Alpern had not alleged any misstatements after December 1991, the date a newspaper article stated UtiliCorp knew of the misappropriations, and before March 12, 1992, the date of Alpern's last stock purchase. In their motion for reconsideration, appellants explained that they had made a typographical error in their complaint, which stated that "[o]n or about January 30, 1991, UtiliCorp announced that it achieved record financial results in 1991" and that net income had increased

in 1991 by 25%, to $73.5 million.  Appellants pointed out they mistakenly referred to UtiliCorp's statement as occurring on January 30, 1991, instead of 1992.  They also asserted that UtiliCorp made other misleading statements on October 31, 1991, November 18, 1991, December 19, 1991, December 23, 1991, January 3, 1992, and January 6, 1992.  The district court nevertheless concluded that summary judgment was still appropriate because appellants had not set forth admissible evidence showing a genuine issue of material fact as to whether UtiliCorp had scienter prior to January 30, 1992.

Consideration of the appellants' evidence would probably produce a different result for Alpern as to whether he had shown an issue of material fact on the date of scienter.  During January 1992, UtiliCorp launched an extensive investigation into the allegations, utilizing personnel from its accounting firm, outside law firm, and own company.  By January 22, UtiliCorp's investigation team had discovered specific acts by Marquez which, according to UtiliCorp's attorneys, justified and even compelled his termination.  Marquez was fired two days later, and Aquila's president was reprimanded.  Evidence of wrongdoing included cancelled checks indicating nearly $90,000 in kickbacks to Marquez on several projects.  In addition, Sheila McDonald had provided a detailed account of how Marquez accomplished these kickbacks.  Blackwell estimated by January 29 that the extent of the kickbacks could reach up to four to five million dollars.

During this time period UtiliCorp made numerous statements of continued financial success and public offerings, and the withheld information about the losses may have been sufficiently significant to a reasonable investor so as to render these statements materially misleading.  See Basic Inc., 485 U.S. at 240.  UtiliCorp had commenced its third public offering on January 22, 1992, preceded by Green's proclamation that UtiliCorp's performance in 1991 was "another milestone."  On January 30, 1992, Green had

22

announced UtiliCorp's 1991 net income had increased 25% to $73.5 million, reflecting Aquila's strategic acquisitions and "the soundness of UtiliCorp's growth strategy . . . [of] reducing risk through expansion."

A reasonable shareholder may have inferred from these representations that UtiliCorp and its subsidiaries would continue to prosper in 1992. UtiliCorp's January 30, 1992 statement and subsequent statements prior to its June 1992 disclosure may therefore have violated its "ever-present duty not to mislead." Id. at 240 n.18. Whether or not UtiliCorp's actions were protected by good faith reliance on its legal and financial advisors is not at issue on this appeal.

Since the appellants' evidence would probably produce a different result as to Alpern's claim for affirmative misstatements, the district court abused its discretion in not reconsidering UtiliCorp's motion for partial summary judgment in light of this evidence. The order denying reconsideration as to Alpern's claim is therefore reversed and remanded.

## c.

Appellants also claim that they should have been permitted to correct the typographical error in their complaint pursuant to Rule 60(a). Although UtiliCorp conceded that this type of error was generally subject to Rule 60(a) relief, the district court denied it. The court noted that it had previously dismissed Alpern's omissions claim after UtiliCorp had paid $368.36 to the clerk of court, covering the amount Alpern paid for stock bought in March 1992. Alpern's affirmative misstatements claim was also limited to this March stock purchase, according to the district court, since he had not shown that UtiliCorp had scienter prior to his other stock purchases. Thus, even if the complaint were corrected to reflect that UtiliCorp's financial statement had occurred on

January 30, 1992, the court concluded that Alpern could not recover damages because of UtiliCorp's tendered offer. The court therefore refused to grant the motion for reconsideration.

Rule 60(a) allows relief from a judgment based on clerical mistakes in the record. Although the rule usually applies to errors by the court or clerk, it may also be used to correct mistakes by the parties. Pattiz v. Schwartz, 386 F.2d 300, 303 (8th Cir. 1968). Where the parties' intentions are clearly defined and "all the court need do is employ the judicial eraser to obliterate a mechanical or mathematical mistake, the modification will be allowed." Matter of West Texas Marketing Corp., 12 F.3d 497, 504-05 (5th Cir. 1994) (typographical errors correctable by Rule 60(a)). Denials of Rule 60(a) motions are reviewed for abuse of discretion. L.Z. v. Parrish, 733 F.2d 585, 588 (8th Cir. 1984).

UtiliCorp's tendered offer of payment to Alpern was not a proper basis to deny relief under Rule 60(a). Alpern was not required to accept it. Judgment should be entered against a putative class representative on a defendant's offer of payment only where class certification has been properly denied and the offer satisfies the representative's entire demand for injuries and costs of the suit. See Rand v. Monsanto Co., 926 F.2d 596, 601 (7th Cir. 1991) (vacating judgment imposing defendant's offer on named representative where district court improperly denied class certification); compare Zimmerman v. Bell, 800 F.2d 386, 390 (4th Cir. 1986) (affirming denial of class certification and dismissal of claim based on defendant's tendered offer fully satisfying plaintiff's damages); compare Kline v. Wolf, 702 F.2d 400, 404-06 (2nd Cir. 1983) (vacating judgment imposing settlement upon putative class representative that deprived him of relief to which he could be entitled after trial).

This rule protects a class representative's responsibilities to the putative class members from being terminated by a

defendant's attempts to pay off the representative's claims.  See Roper v. Consurve, Inc., 578 F.2d 1106, 1110 (5th Cir. 1978), aff'd sub. nom. Deposit Guaranty Nat. Bank, Jackson, Miss. v. Roper, 445 U.S. 326 (1980). Acceptance of a tendered offer "need not be mandated," as then Justice Rehnquist explained, "since the defendant has not offered all that has been requested in the complaint (*i.e.*, relief for the class)." Deposit Guaranty Nat. Bank, 445 U.S. at 341 (concurring opinion).

The district court abused its discretion in not permitting appellants to correct the typographical error in their complaint pursuant to Rule 60(a).  As explained below, class certification should not have been denied on the grounds asserted.  Alpern properly rejected UtiliCorp's offer of payment because it only covered his individual claim and did not provide any requested relief for the class.  Id.

**D.**

Alpern and Miller sought to represent a class alleging § 10(b) and Rule 10b-5 violations of UtiliCorp common stock purchasers between September 1, 1990 and June 15, 1992.  The court denied certification because it had dismissed most of appellants' claims on summary judgment and found Alpern's remaining claim atypical of the putative class.  Appellants contend that their claims were improperly dismissed and that Alpern is typical of the class purchasers because he was an active investor who relied on the integrity of the market price.  Denial of class certification is reviewed for abuse of discretion.  DeBoer v. Mellon Mortg. Co., 64 F.3d 1171, 1175 (8th Cir. 1995), cert. denied sub nom., Michael Thomas Crehan v. Gretchen DeBoer, No. 95-1322, 1996 WL 79875 (U.S. Apr. 22, 1996).

Rule 23(a) permits class certification where

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a); see also General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 156 (1982).  A class representative "must be part of the class and 'possess the same interest and suffer the same injury' as the class members."  Id. (citations omitted).

The district court never discussed in its initial denial of certification, or on reconsideration, whether the proposed class satisfied the elements of numerosity, commonality of legal or factual questions, and fair and adequate representation.  In its ruling on the request it noted that every claim except for Alpern's omissions claim had been dismissed, and the denial of reconsideration of the certification request was presumably based on the dismissal of all claims.

Dismissal of Alpern's claims must be reevaluated in light of the evidence submitted for reconsideration.[9]  The district court did not cite any authority to support its finding that Alpern's claims were not typical of the class claims under Rule 23(a)(3).  Its only explanation in the initial denial order for its ruling was that "Alpern did not make any UtiliCorp stock purchases on the open market" during the relevant period.

Typicality under Rule 23(a)(3) means that there are "other members of the class who have the same or similar grievances as the plaintiff." Donaldson v. Pillsbury Co., 554 F.2d 825, 830 (8th Cir.), cert. denied, 434 U.S. 856 (1977).  The burden is "fairly

---

[9]Since a class representative must be part of the class, Miller cannot represent the class because his claim was properly dismissed.

26

easily met so long as other class members have claims similar to the named plaintiff." DeBoer, 64 F.3d at 1174. Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory. Donaldson, 554 F.2d at 831; see, e.g., DeBoer, 64 F.3d at 1174-75 (typicality requirement satisfied even though class members held different mortgage instruments but sought same form of relief); accord Hoxworth v. Blinder, Robinson & Co., Inc., 980 F.2d 912, 923 (3rd Cir. 1992) (affirming over typicality objections a class of securities investors who had purchased or sold any one of twenty-one securities during a certain period); see generally 1 Herbert B. Newberg, Newberg on Class Actions:  A Manual for Group Litigation at Federal and State Levels § 3.13, at 167 (2d ed. 1985) (claim typical if it challenges the same unlawful conduct affecting named plaintiff and putative class).


Alpern's participation in the DRIP plan does not render his claims atypical of a class including open market purchasers. Alpern alleges that UtiliCorp's financial statements were misleading because it did not disclose the misappropriation at Aquila until June 1992. The same set of events leading up to the June disclosure underlie the claims of the other putative class members. In addition, Alpern's claim invokes the same legal theory -- that UtiliCorp violated § 10(b) and Rule 10b-5 by making knowingly misleading statements or omissions prior to his stock purchases.


Alpern's grievances are thus typical of the class claims because both challenge UtiliCorp's actions and course of conduct with respect to the Aquila misappropriation as violations of § 10(b) and Rule 10b-5. The fact that damage calculations might differ slightly for DRIP and open market purchasers is a minor matter in comparison with these fundamental similarities. See DeBoer, 64 F.3d at 1174; see also In re VMS Securities Litigation,

136 F.R.D. 466, 475-77 (N.D. Ill. 1991) (certifying global class of open market and dividend reinvestment plan purchasers because defendants misled all investors by painting an overly optimistic financial picture in violation of § 10(b)); In re Lilco Securities Litigation, 111 F.R.D. 663, 673 (E.D.N.Y. 1986) (certifying class of all stock purchasers during securities period which included a dividend reinvestment plan representative).

UtiliCorp suggests that Alpern is atypical because a presumption of reliance on the integrity of the market price does not apply in his case. The case UtiliCorp cites in support, In re Bank of Boston Corp. Securities Litigation, 762 F. Supp. 1525, 1533 (D.Mass. 1991), involved a passive dividend reinvestment plan investor who joined out of convenience. In contrast, Alpern testified in deposition that he reviewed UtiliCorp's quarterly and annual reports in order to decide whether to reinvest in UtiliCorp's stock. He also stated that he joined the DRIP plan partly because he would receive a discount from the market price, which indicates at least some reliance on the integrity of that price. Since all investors have a profit incentive to pay attention to issuers' disclosures, as the Supreme Court has explained, it is "hard to imagine that there ever is a buyer or seller who does not rely on market integrity." Basic Inc., 485 U.S. at 246-47 (citation omitted).

The district court abused its discretion in denying certification of the § 10(b) and Rule 10b-5 class for the reasons on which it relied and in denying the motion for reconsideration. On remand, the district court should consider the requirements of Rule 23(a) in light of the evidence in the record, including that submitted for reconsideration.

**IV.**

Finally, Alpern argues that the district court erred in

28

granting UtiliCorp's motion for summary judgment as to his § 11 claim, and in denying certification of the § 11 subclass. Alpern alleges he reinvested his dividend payments in UtiliCorp common stock seven times between September 12, 1990 and March 12, 1992, based on UtiliCorp's September 4, 1990 DRIP prospectus and subsequent financial updates. He contends that these UtiliCorp statements were false and misleading, in violation of Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, because they did not disclose the misappropriations. The district court granted summary judgment in favor of UtiliCorp after determining that Alpern could not recover any statutory damages. Since the § 11 claims raised on behalf of Alpern and the subclass had been dismissed, the court also held that the appellants' motion for certification of a subclass was moot, and later denied reconsideration of the certification order.

As noted, Rule 56(c) provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A grant of summary judgment is reviewed de novo with all inferences from the evidence drawn in favor of the nonmoving party. See Reich v. ConAgra, Inc., 987 F.2d 1357, 1359 (8th Cir. 1993). Summary judgment is inappropriate "[i]f reasonable minds could differ as to the import of the evidence." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

Section 11 of the 1933 Securities Act provides for recovery of damages from certain issuers of registered securities when a purchaser relies on false or misleading information in a registration statement. 15 U.S.C. § 77k(a); Herman & MacLean v. Huddleston, 459 U.S. 375, 381 (1983). Misstatements in the DRIP prospectus can be actionable under § 11 because the prospectus was

incorporated by UtiliCorp's August 1990 Registration Statement.  See In re AnnTaylor Stores Securities Litigation, 807 F. Supp. 990, 993 (S.D.N.Y. 1992).  A claim under § 11 does not require proof of reliance, causation, or scienter, but only materiality and damages.  See Ross v. Warner, No. 77 CIV. 243, 1980 WL 1474, at *7 (D.C.N.Y. Dec. 11, 1980).

Damages are measured according to one of three formulas specified in § 11(e).  The relevant measure of damages for Alpern's claim is contained within the following provision:

> The suit authorized under subsection (a) of this section may be to recover such damages as shall represent **the difference between the amount paid for the security** (not exceeding the price at which the security was offered to the public) **and (1) the value thereof as of the time such suit was brought**. . . .

15 U.S.C. § 77k(e) (emphasis added).[10]

Since Alpern still possesses his stock, he can recover damages under § 11(e)(1) only if his purchase price was higher than the security's value "as of the time such suit was brought."  Id.  The parties disagree as to which date should determine "the time such suit was brought."

UtiliCorp notes that the only suit mentioned in § 11(e) is "the suit authorized under subsection (a)" of § 11, 15 U.S.C. § 77k(a), which provides a cause of action for a misleading registration statement.  It therefore argues that the district court correctly chose the date of August 6, 1992, because that is when Alpern added a claim authorized by § 11(a) to his complaint.  Since the price of UtiliCorp stock on August 6, 1992 was $27.25 per share, and the highest price Alpern paid was $26.885 per share,

---

[10]The other two measures of damages provided apply when the security has been sold, either before or after the action is filed.  15 U.S.C. § 77k(e).

30

Alpern would not have suffered any statutory damages if the "time such suit was brought" refers to August 6.

Alpern responds that his § 11 claim relates back, under Fed.R.Civ.P. 15(c)(2), to the date on which his complaint was filed on June 17, 1992. He also argues that UtiliCorp's theory would encourage a plaintiff to "damage shop" by waiting to file an independent § 11 claim after the stock price drops further. The statute must therefore refer to the date when the securities action was commenced, not when an amended complaint was filed. The relevant date for measuring his damages is accordingly June 17, 1992, the date he filed his initial complaint, alleging securities violations under § 10(b) and Rule 10b-5. Although the value of UtiliCorp stock on June 17, 1992 is not clearly stated in the record, the price per share was $22.88 on June 16, 1992.

The meaning of the term "the time such suit was brought" must be examined first in light of the statutory language. See Landreth Timber Co. v. Landreth, 471 U.S. 681, 685 (1985). Section 11(e) specifically sets forth the method of calculating damages in every action brought under § 11, see McMahan & Co. v. Wherehouse Entertainment, Inc., 65 F.3d 1044, 1048 (2d Cir. 1995), but it does not define "the time such suit was brought."[11]

UtiliCorp has not cited any case which has held that "the time such suit was brought" means the date an individual § 11 claim is filed, but there are cases which touch on the triggering filing date for measuring damages under § 11(e)(1). See, e.g., In re Fortune Systems Securities Litigation, 680 F. Supp. 1360, 1369

---

[11]The legislative history also does not speak to what Congress intended by "the time such suit was brought." The current version of § 11(e) was enacted in the 1934 amendments to the Securities Exchange Act of 1933. A 1934 House Report provides several reasons for various amendments, but all concern other provisions in § 11(e). See H.R. REP. NO. 1838, 73rd Cong., 2d Sess. 41-42 (1934).

(N.D.Cal. 1987) (measuring damages from date plaintiffs filed an earlier securities action in state court); <u>Grossman v. Waste Management, Inc.</u>, 589 F. Supp. 395, 415 (N.D.Ill. 1984) (measuring damages from date plaintiff filed initial lawsuit with a § 11 claim that was consolidated with a later § 10(b) and Rule 10b-5 case); <u>see</u> <u>also</u> <u>In re Worlds of Wonder Sec. Litig.</u>, 814 F. Supp. 850, 866 (N.D. Cal. 1993), <u>aff'd in part and rev'd in part on other grounds</u>, 35 F.3d 1407 (9th Cir. 1994).[12]

A case which discusses the statutory commencement time is <u>Beecher v. Able</u>, 435 F. Supp. 397 (S.D.N.Y. 1977). The court there chose the date that the first of three consolidated § 11 actions was filed as "the time such suit was brought." <u>Id.</u> at 402. It explained that the entire plaintiff class had been contemplated at the time the first action was filed and that using that filing date could minimize date shopping in future cases, thereby limiting multiple identical suits. <u>Id.</u>

Alpern argues that his § 11 damages may be calculated from the date he filed his initial complaint based on the relation back doctrine of Rule 15(c)(2). He reasons that because his § 11 claim arises from the same misappropriations as his § 10(b) and Rule 10b-5 claim, and because UtiliCorp had the same duty to disclose material facts in order to render its financial statements not misleading, his amended complaint dates back to the filing date of his initial complaint on June 17, 1992. UtiliCorp responds that the district court properly concluded that Rule 15(c)(2) has no bearing on this issue because it would only permit relation back of

---

[12]The § 11 issue in <u>In re Worlds of Wonder</u> related to a loss causation defense on which the circuit court reversed. 35 F.3d at 1421-23. In its § 11 discussion the district court had stated in passing that the measure of damages is "the difference between the amount paid for the security and its price at either the time it was sold or the date the Section 11 claim was filed." 814 F. Supp. at 866. There was no discussion about the meaning of "the time such suit was brought."

32

the § 11 claim for statute of limitations purposes.

Fed.R.Civ.P. 15(c)(2) provides that an amended complaint relates back to the date of the original complaint where "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." The basic inquiry is whether the amended complaint is related to the general fact situation alleged in the original pleading. In re Bellanca Aircraft Corp., 850 F.2d 1275, 1283 (8th Cir. 1988).

Since the purpose of Rule 15(c) is to permit cases to be decided on their merits, see Gridley v. Cunningham, 550 F.2d 551, 553 (8th Cir. 1977), it has been liberally construed. Thus, relation back has been permitted of amendments that change the legal theory of the action, see, e.g., Donnelly v. Yellow Freight System, Inc., 874 F.2d 402 (7th Cir. 1989), aff'd on other grounds, 494 U.S. 280 (1990), add other claims arising out of the same transaction or occurrence, see, e.g., Federal Deposit Ins. Corp. v. Bennett, 898 F.2d 477 (5th Cir. 1990), or increase the amount of damages claimed. See, e.g., Wm. T. Burton, Inc. v. Reed Roller Bit Co., 214 F. Supp. 84 (W.D.La. 1963).

Although the relation back doctrine is typically applied with reference to statutes of limitations, courts have utilized the concept for other purposes. See, e.g., Hamilton v. 1st Source Bank, 895 F.2d 159, 161 (4th Cir.) (to measure back pay), rev'd on other grounds, 928 F.2d 86 (1990) (en banc);[13] Sunkyong Intern. v.

_____

[13]In Hamilton, the plaintiff filed an initial complaint alleging discriminatory discharge because of age, and then amended it some three months later to add a claim of pay discrimination based on evidence disclosed during pretrial discovery. 895 F.2d at 161. Under the federal age discrimination statute, Hamilton's recovery of back pay for a nonwillful violation of pay discrimination was limited to two years prior to the filing of a complaint. Id. at 165. In the original panel opinion, the Fourth
Circuit chose the date Hamilton filed his initial complaint for purposes of determining the date when the back pay period would begin to run. Both claims arose out of the same allegedly

33

<u>Anderson Land & Livestock Co.</u>, 828 F.2d 1245, 1252-53 (8th Cir. 1987) (to cure defect in service of process); <u>Fifty Associates v. Prudential Insurance Co. of America</u>, 446 F.2d 1187, 1193 (9th Cir. 1970) (to confer retroactive jurisdiction on the district court); <u>see</u> <u>also</u> 3 J. Moore, <u>Moore's Federal Practice</u> ¶ 15.15[5] (1996) (collecting cases).

Alpern's § 11 claim, added in the amended complaint, was based on the same transactions, occurrences, and conduct alleged in the original complaint. Alpern's first complaint alleged § 10(b) and Rule 10b-5 violations based on materially misleading financial statements beginning in January 1992. Shortly thereafter, UtiliCorp itself filed a complaint against Marquez and Stegall, claiming that they began embezzling company funds from September 1, 1990. When Alpern amended his complaint within two months of filing his initial pleading, he enlarged the class period to encompass the period from September 1990. Alpern's § 11 claim was based on the same misappropriations alleged in the original complaint, however. Both of his claims asserted that he was unaware of the misappropriations and that UtiliCorp artificially inflated its stock prices by disseminating materially misleading statements and/or omitting to state material facts necessary to make its statements not misleading.

Other considerations also favor the relation back of the amended complaint. There is no indication of date shopping, the concern identified in <u>Beecher</u>. 435 F. Supp. at 402. Nothing suggests that Alpern sought to capitalize on a further drop in stock prices by waiting for a more favorable date to file his § 11

_____

discriminatory employer practices, and discovery of the pay difference was no surprise to the defendant bank because it knew about its own pay scales. <u>Id.</u>

claim. Rather, he amended his claim less than two months after filing his initial complaint based on additional information discovered about the same underlying occurrences. Since Alpern was a DRIP plan purchaser, UtiliCorp also should not have been surprised that Alpern sought to hold it accountable for its statements related to the DRIP prospectus. See In re Bellanca Aircraft Corp., 850 F.2d at 1283. Finally, it is unlikely that UtiliCorp's defense on the merits will be unfairly prejudiced, and it may also assert reasonable inquiry and good faith belief defenses against a § 11 claim. See Versyss Inc. v. Coopers and Lybrand, 982 F.2d 653, 655 (1st Cir. 1992), cert. denied, 508 U.S. 974 (1993).

Under the circumstances Alpern's amended complaint relates back to the filing date of the original complaint under Rule 15(c)(2). That date, June 17, 1992, is "the time such suit was brought" for purposes of calculating damages under § 11(e)(1). Since Alpern does not indicate the value of UtiliCorp stock on that date, the district court will need to determine the value of the stock on June 17, 1992. If that value is less than the purchase price of $26.885 per share, Alpern may be entitled to recover § 11 damages and should be permitted to proceed with that claim. The district court will also need to reconsider certification of the § 11 subclass.

**V.**

In summary, we affirm in part and reverse in part. The district court's denial of reconsideration and grant of summary judgment on Miller's § 10(b) and Rule 10b-5 claim are affirmed. The grant of summary judgment on Alpern's claims, the denial of certification of the class and subclass, and the denial of the related motions for reconsideration are reversed. The case is remanded for further proceedings consistent with this opinion.

A true copy.

Attest:

RK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.