RILEY, Circuit Judge.
The appellants appeal the district court’s[2] dismissal of their complaint and denial of their motion to amend. The appellants allege the appellees committed securities fraud in violation of section 10(b) of the Securities Exchange Act of 1934 (the Exchange Act), 15 U.S.C. § 78j(b), and related Securities and Exchange Commission (SEC) Rule 10b-5 by failing to make certain accounting adjustments in compliance with Generally Accepted Accounting Principles (GAAP) and by failing to make a timely disclosure regarding a NASDAQ delisting letter. The district court dismissed the complaint for failure to allege the accounting violations with the requisite particularity under Fed.R.Civ.P. 9(b) and for failure to plead facts “giving rise to a strong inference that the defendant[s] acted with the required state of mind” as dictated by the Private Securities Litigation Reform Act (the Reform Act), 15 U.S.C. § 78u-4(b)(2). In re K-tel Int'l, Inc. Sec. Litig., 107 F.Supp.2d 994 (D.Minn.2000). We affirm the district court’s well reasoned opinion.
I. BACKGROUND
K-tel International, Inc. (K-tel) through certain of its current and former officers and directors, Philip Kives, Lawrence Kieves,[3] David Weiner, Corey Fischer, and Jeffrey Koblick (defendants and appel-lees), markets and distributes entertainment and consumer products, including pre-recorded music compilations. During the relevant time period, K-tel common stock was publicly traded on the NASDAQ National Market System (NMS). The appellants constitute a class of those who acquired K-tel common stock between May 8, 1998, and 11:36 a.m. on November 17, 1998 (the Class). The Class alleged that during the class period they suffered damages as a result of violations by K-tel of the anti-fraud provisions of federal securities laws. 15 U.S.C. § 78(b); 17 C.F.R. § 240.10b-5 (1995).
On May 5, 1998, K-tel announced the financial results for the quarter ending March 31, 1998, which reported a decline in sales and income. On May 8, 1998, K-tel filed with the SEC its Form 10-Q for the quarter ending March 31, 1998 (the March 10-Q), echoing the negative information previously disclosed. The March 10-Q represented net tangible assets in excess of $4 million. During the period from May 5, 1998, to June 9, 1998, K-tel’s share price dropped from $33.94 to $11.25.
*887 On October 13, 1998, after an extension of time requested by K-tel, the company filed Form 10-K, an annual report filed with the SEC, for K-tel’s fiscal year ending June 30, 1998. In the June 10-K, K-tel disclosed a shareholders’ equity of $3,774,000, thereby representing K-tel was $226,000 below the $4 million net tangible asset minimum requirement for continued listing on NASDAQ.
On October 19, 1998, the National Association of Securities Dealers (the NASD) notified K-tel that K-tel’s net tangible assets, based upon the June 10-K, had fallen below the $4 million minimum level necessary for continued listing. K-tel made no public announcement at this time of either its receipt of the October 19,1998 delisting letter or its request for a hearing and temporary extension of time to meet the net tangible asset requirement. However, on November 3 and November 10, K-tel made public announcements regarding a partnership with Playboy Online for an online music store and another partnership arrangement with Microsoft.
On November 16, 1998, K-tel filed its Form 10-Q for the quarter ending September 30, 1998 (September 10-Q). The September 10-Q included information regarding negative financial results and also the receipt of the October 19, 1998 NASD letter. K-tel was not actually delisted as a result of the October 19, 1998 NASD letter.
A series of common stock transactions by individual defendants occurred during the class period. Specifically, almost 2.7 million shares of K-tel common stock were sold by four individual defendants between May 8, 1998, and June 9, 1998.[4] From June 9, 1998 to November 17, 1998, there were only two other transactions by the individual defendants; on November 13, 1998, Koblick purchased 27,200 shares through the exercise of stock options, and on November 17, 1998, the day after filing the September 10-Q, Fischer sold 15,000 shares. The Class alleged the individual defendants received over $41 million from the sales of K-tel common stock during the class period.
In its three-count amended complaint, the Class alleged violations of section 10(b) of the Exchange Act and Rule 10b-5 based upon the omission of material adverse information and the knowing or reckless dissemination of false statements (Count I); violations by the individual defendants of section 20(a) of the Exchange Act based upon their alleged wrongful conduct (Count II); and violations by the individual defendants of section 20A of the Exchange Act based upon their sales of common stock (Count III). In Counts II and III, the Class raised claims against individual defendants Kives, Kieves, and Koblick. On appeal the Class does not challenge the district court’s dismissal of these two counts.
The Class alleged that a continuous fraudulent scheme in combination with large stock trades by some of the individual defendants gave rise to the securities law violations in Count I. As alleged, the scheme was characterized by two circumstances. First, the Class alleged two accounting violations gleaned from K-tel’s *888 SEC filings. The Class asserts K-tel knew in March 1998 of a $1,498 million loss due to the poor performance of a subsidiary and K-tel was required by GAAP to write-off the assets of the subsidiary in its March 10-Q filing, filed May 8, 1998. K-tel wrote down assets in that amount by March 1999. Additionally, the Class alleged K-tel failed to disclose future losses of $1.8 million related to the subsidiary, also in violation of GAAP. The Class alleged such overstating of assets in the March 10-Q and the later June 10-K is a violation of GAAP and is evidence of fraud and scienter because K-tel’s inclusion of the overstated assets concealed its inability to comply with the minimum necessary tangible net asset requirement for continued listing on the NMS.
Second, the Class alleged K-tel’s failure to disclose publicly the October 19, 1998 NASD letter is evidence of fraudulent intent. The Class alleged K-tel’s failure to disclose the letter in the four-week period after it was received was a material omission because during the period K-tel was involved in press releases extolling the company’s business including, inter alia, new partnerships with Playboy Online and Microsoft.
The district court granted K-tel’s motion to dismiss all claims pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, and 15 U.S.C. § 78u-4(b)(2), finding the amended complaint failed to allege with sufficient particularity either material misrepresentations or facts giving rise to a strong inference of scienter. Further, the district court denied leave to amend the complaint again and entered judgment for K-tel and the individual defendants.
II. DISCUSSION
The Exchange Act § 10(b) and related rules prohibit “the use of any ‘manipulative or deceptive device or contrivance’ in connection with the purchase or sale of a security.” Alpern v. UtiliCorp United, Inc., 84 F.3d 1525, 1533 (8th Cir.1996) (quoting 15 U.S.C. § 78j(b) and Herman & MacLean v. Huddleston, 459 U.S. 375, 382, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983)); see also In re Navarre Corp. Sec. Litig., 299 F.3d 735, 2002 WL 1760458, slip op. at 8 (8th Cir.2002). Rule 10b-5 provides that it is unlawful:
for any person, directly or indirectly ...
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b-5 (1995).
In order to proceed on claims brought pursuant to section 10(b) and Rule 10b-5, the Class is required to show four elements: (1) misrepresentations or omissions of material fact or acts that operated as a fraud or deceit in violation of the rule; (2) causation, often analyzed in terms of materiality and reliance; (3) scienter on the part of the defendants; and (4) economic harm caused by the fraudulent activity occurring in connection with the purchase and sale of a security. See 17 C.F.R. § 240.10b-5; In re Navarre Corp., 299 F.3d 735, 2002 WL 1760458, slip op. at 9. Alpern, 84 F.3d at 1533-34.
We review the dismissal of a complaint for failure to state a claim upon which relief may be granted de novo, affirming the district court if the plaintiffs cannot prove any set of facts which would entitle *889 them to the relief requested. See In re Navarre Corp., 299 F.3d 735, 2002 WL 1760458, slip op. at 8. In so doing, we construe the complaint liberally, taking all factual allegations as true, but rejecting conclusory or catch-all assertions of law and unwarranted inferences. Id.
The Reform Act[5] embodies the pleading requirement of Fed.R.Civ.P. 9(b). Id. at 10. Under the Reform Act the complaint must also “specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation ... is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed.” 15 U.S.C. § 78u-4(b)(1). In addition, the Reform Act requires “with respect to each act or omission alleged” that a complaint must “state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.” 15 U.S.C. § 78u-4(b)(2). These pleading standards, unique to securities cases, were an attempt to restrain securities fraud litigation abuses such as the practice of pleading by hindsight. In re Navarre Corp., 299 F.3d 735, 2002 WL 1760458, slip op. at 9, 11 (citations omitted).
The Reform Act requirements modify review of a motion to dismiss in two significant ways. First, “we disregard ‘catch-all’ or ‘blanket’ assertions that do not live up to the particularity requirements of the statute.” Florida State Bd. of Admin, v. Green Tree Fin. Corp., 270 F.3d 645, 660 (8th Cir.2001). Second, the complaint must plead specific facts giving rise to a “strong inference” of the required state of mind.[6] Id.; see also In re Navarre Corp., 299 F.3d 735, 2002 WL 1760458, slip op. at 9-10.
Furthermore, because the decision to dismiss a complaint for failure to state a claim involves no factual findings, we owe no deference to the district court. Abels v. Farmers Commodities Corp., 259 F.3d 910, 916 (8th Cir.2001). “[W]e may affirm the district court’s judgment on any basis supported by the record.” Wisdom v. First Midwest Bank, 167 F.3d 402, 406 (8th Cir.1999) (citation omitted). The court may consider, in addition to the pleadings, materials “embraced by the pleadings” and materials that are part of the public record. Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir.1999); see also Green Tree, 270 F.3d at 663.
We will first address the issues surrounding pleading with particularity the allegations related to accounting violations.
A. Pleading with Particularity— GAAP
Generally Accepted Accounting Principles, or GAAP, are “a series of general principles followed by accountants.” United States v. Basin Elec. Power Coop., 248 F.3d 781, 786 (8th Cir.2001). More specifically, GAAP “are the official standards adopted by the American Institute of Certified Public Accountants (the ‘AICPA’), a private professional association, through three successor groups it established: the Committee on Accounting Procedure, the Accounting Principles Board (the ‘APB’), and the Financial Accounting Standards *890 Board (the ‘FASB’).” Ganino v. Citizens Utils. Co., 228 F.3d 154, 160 n. 4 (2d Cir.2000).
“There are 19 different GAAP sources, any number of which might present conflicting treatments of a particular accounting question.” Shalala v. Guernsey Mem’l Hosp., 514 U.S. 87, 101, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995). The sources for GAAP include official publications consisting of APB opinions, FASB Statements and Accounting Research Bulletins (ARB). “Included in GAAP are the Financial Accounting Standards (‘FAS’) published by the [FASB].” Basin Elec., 248 F.3d at 786.
GAAP “are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions. [GAAP], rather, tolerate a range of ‘reasonable’ treatments, leaving the choice among alternatives to management.” Thor Power Tool Co. v. C.I.R., 439 U.S. 522, 544, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979) (footnote omitted); see also Guernsey Mem’l, 514 U.S. at 101, 115 S.Ct. 1232 (finding GAAP “[f]ar from a single-source accounting rulebook” and “not [a]lueid or encyclopedic set of pre-existing rules,” and “GAAP changes and, even at any one point, is often indeterminate”). “When such conflicts arise, the accountant is directed to consult an elaborate hierarchy of GAAP sources to determine which treatment to follow.” Id. In fact, “[i]n the event there is no official pronouncement, the consensus of the accounting profession, as manifested in textbooks, for example, determines GAAP.” Providence Hosp. of Toppenish v. Shalala, 52 F.3d 213, 218 n. 7 (9th Cir.1995).
As our Court recently said: “Allegations of GAAP violations are insufficient, standing alone, to raise an inference of scienter. Only where these allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient.” In re Navarre Corp., 299 F.3d 735, 2002 WL 1760458, slip op. at 15 (internal citation omitted); see also DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 390 (9th Cir.2002); City of Philadelphia v. Fleming Cos., Inc., 264 F.3d 1245, 1261 (10th Cir.2001) (“Only where such allegations [GAAP violations or accounting irregularities] are coupled with evidence that the violations or irregularities were the result of the defendant’s fraudulent intent to mislead investors may they be sufficient to state a claim.”); Ziemba v. Cascade Int’l, Inc., 256 F.3d 1194, 1208 (11th Cir.2001) (citing cases) (Allegations of “violations of ... GAAP, standing alone, do not satisfy the particularity requirement of Rule 9(b).”). Under the Reform Act, the circumstances of the fraud must be stated with particularity, including “such matters as the time, place and contents of false representations, as well as, the identity of the person ... and what was obtained or given up thereby.... This means the who, what, when, where, and how.” Parnes v. Gateway 2000, Inc., 122 F.3d 539, 549-50 (8th Cir.1997). Concluso-ry allegations do not satisfy the pleading requirements of the Reform Act. Id. at 549; In re Carter-Wallace, Inc. Sec. Litig., 220 F.3d 36, 39 (2d Cir.2000).
In this case, the Class alleged violations of Financial Accounting Standard 121 (FAS 121) and Financial Accounting Standard 5 (FAS 5). Generally, the Class alleged K-tel violated FAS 121 and FAS 5 when it filed the March 10-Q, on May 8, 1998, by representing its net tangible assets were in excess of $4 million. The March 10-Q, signed by individuals Kives, Weiner, and Fischer, stated in relevant part:
In 1997, the Company formed an [sic] U.S. media-buying and infomercial-marketing subsidiary, which performed media buying services for third parties and also marketed products through infom *891 ercials produced by third parties. As of March 31, 1988[sic], due to accumulated losses to date of $1,300,000 the Company has curtailed most of these media buying operations and will now focus on its existing primary businesses — music distribution and direct response marketing, and its newly launched Internet retailing business.
Similarly, the Class alleged K-tel continued the fraudulent scheme through the June 10-K filed on October 13, 1998. The June 10-K made an almost identical statement as did the March 10-Q but included the accumulated losses through June 30, 1998 in the amount of $2.3 million. The June 10-K represented net tangible assets below $4 million and was signed by all of the individual defendants.
K-tel counters by arguing the Class is only alleging fraud by hindsight in relying on later write-off amounts in order to argue the write-offs should have been made earlier. Specifically, K-tel points to the complaint which alleged “$800,000 was charged to earnings during the quarter ended September 30, 1998, and $698,000 was charged to earnings during the six-month period ended March 31, 1999.” These two amounts equal $1,498,000, the amount the Class alleged was the subsidiary’s loss known to K-tel in March 1998.
Additionally, the complaint alleged $1.8 million in future losses would be incurred due to this subsidiary’s contracts; however, the Class fails to specify how it arrived at this figure. The figure does not include $1 million of additional accumulated losses (difference between the March 10-Q and the June 10-K) which the Class breaks into $.3 and $.7 million increments, alleging at least the $.3 million amount should have been disclosed in the March 10-Q as it was incurred by May 8,1998.
“[W]e cannot countenance pleading fraud by hindsight .... ” Green Tree, 270 F.3d at 662. “Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud.” Acito v. IMC-ERA Group, Inc., 47 F.3d 47, 53 (2d Cir.1995). “Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them.” Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir.2000); see also In re Navarre Corp., 299 F.3d 735, 2002 WL 1760458, slip op. at 12; Acito, 47 F.3d at 53. Under the Reform Act the complaint must allege “facts or further particularities that, if true, demonstrate that the defendants had access to, or knowledge of, information contradicting their public statements when they were made.” In re Navarre Corp., 299 F.3d 735, 2002 WL 1760458, slip op. at 11.
What makes many securities fraud eases more complicated is that often there is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation, and that therefore simply because the alleged misrepresentation conflicts with the current state of facts, the charged statement must have been false.... [A] plaintiff must set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading ivhen made.
City of Philadelphia, 264 F.3d at 1260 (quoting In re GlenFed Sec. Litig., 42 F.3d 1541, 1548-49 (9th Cir.1994) (en banc)).
1. FAS 121.
FAS 121 relates to the accounting for the impairment and disposal of long-lived assets and certain identifiable intangibles. Specifically, FAS 121:
[R]equires that long-lived assets and certain identifiable intangibles to be held and used by an entity be reviewed for impairment whenever events or changes in circumstances indicate that the carry *892 ing amount of an asset may not be recoverable. In performing the review for recoverability, the entity should estimate the future cash flows expected to result from the use of the asset and its eventual disposition. If the sum of the expected future cash flows ... is less than the carrying amount of the asset, an impairment loss is recognized. Otherwise, an impairment loss is not recognized.
FAS 121, summary available at http://ac-counting.rutgers.edu/raw/fasb/map/in-dex.html.
The Class alleged the asset subject to FAS 121 review is the Infomercial Subsidiary. No review for the impairment of this asset was reflected in the March 10-Q. The Class alleged K-tel was required by FAS 121 to perform the review because a change in circumstances—namely the curtailing of operations and stated losses— indicated the recoverability of the carrying amount of the subsidiary assets should have been assessed for impairment. The Class further alleged an assessment would have revealed K-tel’s obligation pursuant to FAS 121 to write-off the $1,498,000 cost of non-useable infomercials and other media items purchased by the subsidiary. K-tel later charged $800,000 to earnings for the quarter ending September 30, 1998, and $698,000 during the six-month period ending March 31,1999.
K-tel argues the complaint contains no particularized allegation supporting the $1,498,000 figure or the asset or assets subject to FAS 121 assessment. Further, K-tel contends the Class has failed to allege facts implicating a violation of FAS 121. K-tel concludes the Class failed to allege facts showing FAS 121 had been triggered and violated.
Although a change in circumstances occurred by the curtailing of operations, which may implicate FAS 121, the complaint failed to allege particular assets subject to FAS 121 assessment. If, however, the assets intended by the Class include the subsidiary itself or unspecified “infomercials and other media items,” we are unconvinced FAS 121 is implicated.
The district court found, and we agree, “‘long-lived assets’ include items such as land, buildings, equipment and furniture.” In re K-tel, 107 F.Supp.2d. at 1000 (listing accounting sources). “ ‘Identifiable intangibles’ include items such as patents, franchises, and trademarks.” Id. The assets alleged by the Class are not long-lived assets or identifiable intangibles. Therefore, as a matter of law, the Class has failed to allege facts triggering FAS 121.
Rather than argue the district court erred as a matter of law, and submit contrary accounting sources, the Class states, untenably, the district court made its determination as a factual finding. While the allegations contained in the complaint may withstand standard notice pleading, such allegations were not pled with particularity as required by the Reform Act in terms of alleging a basis for implicating FAS 121 and further specifying the assets, the carrying amount and the impairment of such assets. See Greebel v. FTP Software, Inc., 194 F.3d 185, 204 (1st Cir.1999) (plaintiffs presented invoices, purchase orders, and other documentation to substantiate their contentions).
Furthermore, the Class has faded to allege any basis or source for why $1,498,000 should have been written off in March 1998 pursuant to FAS 121, rather than in September 1998 and March 1999 pursuant to other accounting rules. Accordingly, the Class allegations related to FAS 121 fail for lack of particularity.
2. FAS 5.
FAS 5 establishes standards of financial accounting and reporting for loss contingencies. FAS 5:
*893 [R]equires accrual by a charge to income (and disclosure) for an estimated loss from a loss contingency if two conditions are met:
(a) information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements, and
(b) the amount of loss can be reasonably estimated.
FAS 5, summary available at http://ac-counting.rutgers.edu/raw/fasb/map/in-dex.html.
The Class alleged FAS 5 required K-tel to make a $1.8 million charge to income and disclose the subsidiary’s future obligations and likely losses. The Class alleged that the subsidiary:
a. Was obligated to perform under one or more contracts which were likely to result in additional future losses of approximately $1.8 million (over and above those which had already been reported) during the twelve month period ended March 31, 1999; and
b. Had already sustained no less [than] $.3 million in additional losses (over and above the accumulated losses of $1,300,000 which had been reported) as of the May 8, 1998 date of filing of the March 31, 1998 Form 10-Q, and would suffer an additional $.7 million in losses by June 30, 1998.
Again, the Class fails to provide any basis for the allegations or sources for the amounts, other than later financial disclosure made by K-tel. The Class fails to specify any contracts or circumstances that K-tel knew at the time of the March 10-Q or June 10-K would result in the specified losses. Merely stating a particular dollar amount without a corresponding source or basis is insufficient under the Reform Act. See Parnes, 122 F.3d at 550. The complaint does not explain what specific information was available and how any loss could be reasonably estimated for the March 10-Q or the June 10-K. Accordingly, the Class allegations related to FAS 5 also fail for lack of particularity.
B. Scienter
Scienter is not explicitly required by the statutory text of the Exchange Act, but it is an acknowledged essential element of a section 10(b) and Rule 10b-5 claim. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); Green Tree, 270 F.3d at 653; Alpern, 84 F.3d at 1534. “[W]e view the investors’ amended complaint to determine whether they set forth facts that give a strong reason to believe that there was reckless or intentional wrongdoing.” In re Navarre Corp., 299 F.3d 735, 2002 WL 1760458, slip op. at 16.
Traditionally, there are three methods of establishing scienter. First, scienter may be established from facts demonstrating “a mental state embracing intent to deceive, manipulate, or defraud.” Hochfelder, 425 U.S. at 193 n. 12, 96 S.Ct. 1375; Alpern, 84 F.3d at 1534; Helwig, 251 F.3d at 548. Second, while allegations of negligent conduct are not sufficient, Hochfelder, 425 U.S. at 215, 96 S.Ct. 1375, conduct which rises to the level of severe recklessness may be sufficient to meet the scienter requirement. K & S P’ship v. Continental Bank, N.A., 952 F.2d 971, 978 (8th Cir.1991). Such sufficient conduct is limited to “highly unreasonable omissions or misrepresentations” involving “an extreme departure from the standards of ordinary care, and ... presenting] a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.” Id. (citing Woods v. Barnett *894 Bank of Fort Lauderdale, 765 F.2d 1004, 1010 (11th Cir.1985)).
Recently, we determined the effect of the third method of establishing a strong inference of scienter, allegations of motive and opportunity. “[M]otive and opportunity are generally relevant,” but particularly important to establishing scienter is a showing of unusual or heightened motive to meet the Reform Act standard. Green Tree, 270 F.3d at 660. Additionally, the facts giving rise to motive and opportunity may also support a “reason to believe the defendant’s misrepresentation was knowing or reckless.” Id. Finally, without a showing of motive or opportunity “other allegations tending to show scienter would have to be particularly strong in order to meet the Reform Act standard.” Id.; see also In re Navarre Corp., 299 F.3d 735, 2002 WL 1760458, slip op. at 16-17.
Generally, the issue of whether a particular intent existed is a question of fact for the jury. Press v. Chemical Inv. Servs. Corp., 166 F.3d 529, 538 (2d Cir.1999). Since “ ‘conclusory allegations’ do not satisfy the pleading requirements of Rule 9(b),” the complaint must provide a factual basis for allegations of scienter. In re Carter-Wallace, Inc. Sec. Litig., 220 F.3d at 40; see Parnes, 122 F.3d at 549-50. Additionally, unsupported allegations with regard to motives generally possessed by all corporate directors and officers are insufficient as a matter of law. See Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir.2001); Green Tree, 270 F.3d at 664 (finding a desire “universally held among corporations and their executives ... does not contribute significantly to an inference of scienter”). The “plaintiffs must assert concrete and personal benefit to the individual defendants resulting from the fraud.” Kalnit, 264 F.3d at 139.
The Second Circuit has found insufficient motives to include “1) the desire for the corporation to appear profitable and 2) the desire to keep stock prices high to increase officer compensation.” Id. However, alleging the defendants misrepresented corporate performance in order to keep stock prices inflated while selling stock is sufficient. Novak, 216 F.3d at 308. In contrast, evidence that the individual defendants abstained from trading may undercut allegations of motive. Acito, 47 F.3d at 54; see Green Tree, 270 F.3d at 663 (noting same, but finding no allegations of insider trading).
We agree with the Second Circuit. More specifically, we have found where an individual defendant will benefit to an unusual degree, based upon the magnitude of a compensation package tied to earnings and the timing of an overstatement of earnings, motive is sufficiently pled. Green Tree, 270 F.3d at 661. However, the general desire to maintain a high credit rating or make a company appear attractive to potential buyers may be “too thin a reed on which to hang an inference of scienter.” Id. at 664.
1. Accounting violations.
As discussed above, allegations of GAAP violations, alone, are insufficient to state a claim for securities fraud. In re Navarre Corp., 299 F.3d 735, 2002 WL 1760458, slip op. at 15. The Class alleged K-tel knew or was reckless in not knowing prior to filing the March 10-Q that a subsidiary or its assets had been impaired and that K-tel was required by FAS 121 to write-off the assets in the amount of $1,498,000. The Class claimed such knowledge was evident in K-tel’s stated intention to curtail subsidiary activities. It contended the write-off was not timely completed with the purpose of inflating stock prices until after the delisting issue was resolved and the individual defendants had completed millions of dollars in insider trading. Further, the Class alleged the failure to write-off the *895 impaired assets resulted in an overstating of assets, net worth and earnings. Finally, the Class claimed the March 10-Q was materially false and misleading when it stated the subsidiary operations had been curtailed because the subsidiary had contract obligations which would result in additional losses of $1.8 million about which FAS 5 required disclosure in May 1998.
The Class alleged K-tel’s knowing overstatement of assets in violation of GAAP evinces fraudulent intent. It claimed K-tel’s asset base was deteriorating due to the losses sustained, and expected to sustain, by the subsidiary. The Class contended K-tel deferred GAAP imposed write-offs in order to artificially maintain an asset base of over $4 million, NASDAQ’s minimum net asset value requirement for listing. The deferral allegedly facilitated the sale of stocks by four of the individual defendants prior to public disclosure of the possibility of delisting. The Class further alleged the individual defendants, as executives of the company, by at least May 8, 1998, knew of the facts surrounding the improper accounting conduct. Specifically, the Class concluded K-tel stated its intentions to curtail the activities of the subsidiary, thereby acknowledging the impaired nature of the assets. Finally, the Class alleged the sheer magnitude of the GAAP violations exhibit scienter.
The Class alleged multiple motives for the individual defendants including (a) inflating the price of K-tel’s common stock, (b) avoiding or delaying NASDAQ de-listing, (c) deferring adverse effects of NASDAQ delisting, (d) increasing compensation directly tied to stock price, and (e) protecting employment with K-tel. The motive allegations are insufficient to support scienter. We will address them in reverse order.
As stated above, general allegations of a desire to increase stock prices, increase officer compensation or maintain continued employment are too generalized and are insufficient. See Kalnit, 264 F.3d at 139. While such allegations may be sufficient if the benefit to an individual defendant is unusual, Green Tree, 270 F.3d at 661, no such allegations were pled in this case. The Class failed to allege how or to what extent the defendants’ compensation or continued employment was tied to stock price or to what degree, if any, the defendants benefitted.
The motive allegations related to delisting are insufficiently pled to support a finding of a strong inference of fraudulent intent. Even assuming GAAP violations occurred, the Class has alleged no facts to support the inference that the individual defendants violated GAAP in the March or the June, 1998 reports to avoid delisting. The Class allegation assumes the defendants knew they would be receiving a delisting letter and would, in fact, be delisted. The record shows K-tel was not delisted, even though the June 10-K represented the company was below NASDAQ requirements for continued listing and the NASD delisting letter was sent October 19, 1998. Further, an intent to “curtail” certain activities based on past losses does not, by itself, raise a red flag that nearly $1.5 million in assets need be immediately written off. The Class has failed to allege facts demonstrating K-tel had the intent to defraud.
The Class contends massive insider trading is evidence of the defendants’ motive to commit fraud through inflating stock price. “[U]nusual insider trading activity during the class period may permit an inference of bad faith and scienter.” Acito, 47 F.3d at 54. Here, however, the Class alleged only conclusory statements that the insider sales were unusual or suspicious. Such conclusory and speculative allegations are insufficient. See In re Comshare, Inc., Sec. Litig., 183 F.3d 542, *896 553 (6th Cir.1999). The Class failed to allege the prior history of sales for the defendants or even the number of shares held by each. See Greebel, 194 F.3d at 207 (holding plaintiffs’ failure to provide information regarding sales made by insiders at times outside the class period permitted no possibility of comparison). Therefore, the Class failed to allege facts to show the trading activity was unusual or how it was unusual.
Additionally, taking each defendant individually decreases any inference of scien-ter. Kieves, company president in October 1998 and previously on the board of directors, sold no shares of common stock during the class period. Kieves’s conduct actually undercuts the Class’s argument. See Acito, 47 F.3d at 54.
Weiner sold 890,000 shares between May 8,1998, and May 26, 1998, for approximately $11.7 million. Weiner’s conduct should not materially impact the scienter analysis because he resigned as company president in August 1998. See Greebel, 194 F.3d at 206 (“It is not unusual for individuals leaving a company, like [defendant], to sell shares.”).
The complaint alleged the remaining defendants sold shares between May 8, 1998, and June 9,1998, during a period when the stock price experienced a steady decline from approximately $34 to $11.25. Specifically, Kives, who owned 42% of K-tel’s common stock, sold 2,202,303 shares between May 11, 1998, and June 9, 1998, for over $26 million; Fischer sold 6,000 shares on May 8, 1998, for approximately $195,000; and Koblick sold 82,178 shares on May 8, 1998, for approximately $2.6 million. As alleged in the complaint, on May 5, 1998, K-tel announced the financial results for the quarter ending March 31, 1998, which included a decline in sales and income. On May 8, 1998, K-tel filed its March 10-Q, echoing the negative information previously disclosed. “Selling after delivering news that causes a company’s stock price to go down is not suggestive of withholding information.” Greebel, 194 F.3d at 207 (finding no sales were made before a big “event” was made known to the public, and sales were made after negative information was disclosed and before positive information was disclosed); see Nathenson v. Zonagen Inc., 267 F.3d 400, 418 (5th Cir.2001) (decrease in stock price after allegedly misleading disclosure precluded action under fraud-on-the-market theory). Therefore, similar to the Greebel court, we find, “[a]lthough the total sum involved was large, the ... plaintiffs produced no evidence that the trading was out of the ordinary or suspicious.” Greebel, 194 F.3d at 207.
If we were to conclude the trading provides circumstantial evidence of scien-ter, the claim would still fail because the trading did not coincide with false or misleading statements, which is required to survive dismissal. See In re Navarre Corp., 299 F.3d 735, 2002 WL 1760458, slip op. at 20. Accordingly, it is not possible to draw a “strong inference” of scienter based on (a) the alleged accounting violations or (b) the alleged improper trading.
2. October 1998 delisting letter.
The Class alleged K-tel’s failure to disclose the October 19, 1998 delisting letter when received, or at least contemporaneous with other public announcements, is evidence of a strong inference of fraudulent intent because the failure created a material omission.
We agree with the district court that the Class failed to show a strong inference of scienter. We will assess this claim only with regard to the delisting letter allegations, namely, whether they meet the materiality requirement for securities fraud. See 17 C.F.R. § 240.10b-5; *897 Alpern, 84 F.3d at 1533-34.[7] Generally, the issue of whether a public statement is misleading is a mixed question of law and fact for the jury. Silver v. H & R Block Inc., 105 F.3d 394, 396 (8th Cir.1997). “The issue is appropriately decided as a matter of law, however, when reasonable minds could not differ. In other words, if no reasonable investor could conclude public statements, taken together and in context, were misleading, then the issue is appropriately resolved as a matter of law.” Id. (citation omitted); see Press, 166 F.3d at 538. “Accordingly, a complaint that alleges only immaterial misrepresentations presents an ‘insuperable bar to relief ... and dismissal of such a complaint is proper.” Parnes, 122 F.3d at 546 (quoting Fusco v. Xerox Corp., 676 F.2d 332, 334 (8th Cir.1982)).
A fact is material if it is substantially likely “that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the ‘total mix’ of information made available.” Basic Inc. v. Levinson, 485 U.S. 224, 231-32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (citation omitted) (adopting the standard of materiality from TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), for section 10(b) and Rule 10b-5 claims); see Parnes, 122 F.3d at 546. Material information is that which “would have assumed actual significance in the deliberations of the reasonable shareholder.” TSC Indus., 426 U.S. at 449, 96 S.Ct. 2126; see Press, 166 F.3d at 538. This determination requires “delicate assessments of the inferences a ‘reasonable shareholder’ would draw from a given set of facts and the significance of those inferences to him.” TSC Indus., 426 U.S. at 450, 96 S.Ct. 2126. In contrast, a fact is immaterial “[w]here a reasonable investor could not have been swayed” by the misrepresentation. Parnes, 122 F.3d at 546. Immaterial statements include vague, soft, puffing statements or obvious hyperbole. Id. at 547 (finding a prediction of “significant growth” is immaterial).
K-tel argues its failure to disclose the delisting letter prior to November 16, 1998, cannot be considered as part of a showing of scienter because it did not have a duty to disclose the delisting letter. The parties agree that a duty to disclose the letter arises only when 1) a regulation, statute or rule requires disclosure; 2) disclosure is required to prevent a voluntary statement from being misleading; or 3) the defendants are engaging in insider trading. See Backman v. Polaroid Corp., 910 F.2d 10, 12-13 (1st Cir.1990) (en banc). In this case the parties agree K-tel had no duty to disclose pursuant to regulation, statute or rule.[8]
*898 “Materiality alone is not sufficient to place a company under a duty of disclosure.” In re Sofamor Danek Group, Inc., 123 F.3d 394, 400 (6th Cir.1997). In fact, “[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5.” Basic Inc., 485 U.S. at 239 n. 17, 108 S.Ct. 978. “A duty arises, however, if there have been inaccurate, incomplete or misleading disclosures.” Sailors v. Northern States Power Co., 4 F.3d 610, 612 (8th Cir.1993). Therefore, “even absent a duty to speak, a party who discloses material facts in connection with securities transactions assume[s] a duty to speak fully and truthfully on those subjects.” Helwig, 251 F.3d at 561 (internal quotations and citation omitted). However, the requirement is not to dump all known information with every public announcement, but the law requires “an actor to provide complete and non-misleading information with respect to the subjects on which he undertakes to speak." Id. (internal quotations and citation omitted) (emphasis added). In this case, the Class argues four public statements made by K-tel rendered misleading the omission of a public disclosure regarding the de-listing letter.
The first public statement made by K-tel was on November 3, 1998. K-tel’s vice president of corporate development stated, with regard to the new partnership agreement with Playboy Online: “We expect the Playboy/K-tel Music Store to compete with leading online music services such as CDNow, Inc., N2K, Inc., and Amazon.com, Inc.”
The defendant Lawrence Kieves made two statements on November 10, 1998. Kieves announced, with regard to the partnership with Microsoft: “Microsoft’s extensive online outreach to the consumer is in a league of its own and will further enhance the K-Tel Express brand name across the Internet.” Additionally, Kieves appeared on CNBC stating: “We’re looking at several options now, we’re looking at several strategic opportunities for our Company that would be very premature to announce right now, including most traditional financing options: a secondary offering, perhaps partnering up with somebody in a strategic venture with regard to our sales.”
Finally, on November 12, 1998, after the close of the market, but prior to filing the September 10-Q, K-tel reported its financial results for the quarter ending September 30, 1998, by press release. The Class alleged only that the November 12 press release did not include information about the October 19, 1998 delisting letter, nor did it include enough information to determine whether K-tel was in compliance with the listing requirements. The Class does allege, however, K-tel common stock closed down $8 per share the next day.
The first two statements, relating to Playboy Online and Microsoft were not rendered misleading based upon K-tel’s failure to disclose the receipt of the de-listing letter. While the fact K-tel had received the delisting letter may have been material, no duty to disclose was triggered by the partnering statements. The de-listing letter was unrelated to the subject matter of the statements.
K-tel’s third statement, made by Kieves on CNBC, is so vague, cautionary and such obvious puffing that no reasonable investor would have relied on it. See Parnes, 122 F.3d at 547. Specifically, Kieves stated it would be “very premature” to announce anything more, a cautionary note rendering the statement immaterial as a matter of law. See id. at 548. Furthermore, Kieves seemed to describe tentatively the strategic partnerships which had already been announced by saying, “perhaps partnering up with somebody in a strategic venture with regard to our sales.” Such statements are *899 not specific enough to perpetuate fraud on the market. See id. at 550. Furthermore, the statement does not implicate the de-listing letter, nor was the immaterial statement made misleading without disclosure of the letter.
The financial results publicly disclosed on November 12, 1998, may have been rendered misleading by failure also to include notice of the delisting letter. At the very least, such would be a jury question. See Silver, 105 F.3d at 396. The subject matter is closely linked and underlying assumptions were at least colored by the letter. This determination does not end the discussion, however.
The Class argued the individual defendants, by reason of the material omission, were obligated to either disclose the letter or abstain from trading. In fact, the defendants did abstain from trading until the letter had been disclosed with the filing of the September 10-Q on November 16, 1998, just four days after the November 12, 1998, public disclosure of financial results. The complaint alleged no individual defendants sold shares between June 9, 1998, and November 17, 1998, and no other significant event or harm allegedly occurred within the four days between November 12 and 16.
Accordingly, we find, as a matter of law, failure to disclose the delisting letter prior to November 16, 1998, does not give rise to a “strong inference” of scienter.
D. Motion to Amend
Finally, the Class contends the district court abused its discretion in denying the Class leave to replead its complaint for a third time. We find no merit in this argument.
Under Rule 15 of the Federal Rules of Civil Procedure, leave to amend should be granted freely “when justice so requires.” Fed.R.Civ.P. 15(a). “However, futility constitutes a valid reason for denial of a motion to amend.” Knapp v. Hanson, 183 F.3d 786, 790 (8th Cir.1999). Generally, we review the denial of a motion to amend for abuse of discretion. Id. However, our review of the denial of leave to amend based upon futility is de novo where such denial is based upon the failure of the amended complaint to state a claim. See United States ex rel. Gaudineer & Comito, L.L.P. v. Iowa, 269 F.3d 932, 936 (8th Cir.2001).
In the present case, in denying the Class leave to amend, the district court stated the Class had failed, with nine months elapsing between the filing of the complaint and the amended complaint, to plead facts with sufficient particularity to raise a strong inference of scienter. Further, the district court, after a hearing on the matter, found insufficient evidence that the Class could cure the amended complaint. During the hearing, the Class told the court it had already alleged what it knew and admitted it could not plead certain claims with any greater precision.
The Class provides no further support for this court on appeal to explain how it would amend the complaint to add particularity. See Brandt v. Davis, 191 F.3d 887, 893 (8th Cir.1999) (finding no abuse of discretion where party failed to “explain how he would amend the complaint to save the claim”); Wisdom v. First Midwest Bank, of Poplar Bluff, 167 F.3d 402, 409 (8th Cir.1999) (“parties should not be allowed to amend their complaint without showing how the complaint could be amended to save the meritless claim”).
Under the circumstances presented, we find the abuse of discretion standard is applicable because rather than find a specific allegation futile as a matter of law, the district court found it futile to amend where no actual amendments were possible. Therefore, we find the district court did not abuse its discretion in deny *900 ing leave to amend the complaint. We would also affirm the denial of the motion to amend under the de novo standard.
III. CONCLUSION
Congress has obviously raised the pleading bar for securities fraud complaints. President William Clinton vetoed the Reform Act on December 19, 1995, because he disagreed with the intent of the Conference Committee in “erectpng] a higher barrier to bringing suit than any now existing-one so high that even the most aggrieved investors with the most painful losses may get tossed out of court before they have a chance to prove their case.” 141 Cong. Rec. S19035 (daily ed. Dec. 21, 1995) (veto message of President Clinton). With the President’s message in hand, Congress overrode the veto.
K-tel’s motion to dismiss was properly granted. Accordingly, we affirm the judgment of the district court.

. The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

.The case captions in both the district court and this Court spell this individual's name as Lawrence "Kives.” The remaining documents filed with both courts reflect the name is spelled Kieves. Therefore, this court will reference him as Kieves.

. The complaint alleged: Kives, who owned 42% of K-tel’s common stock, sold 2,202,303 shares between May 11, 1998, and June 9, 1998, for over $26 million; Kieves sold no shares of common stock during the class period; Weiner, who resigned in August 1998, sold 390,000 shares between May 8, 1998, and May 26, 1998, for approximately $11.7 million; (Fischer sold 30,000 shares on May 8, 1998, (6,000 shares) and on November 17 and 18, 1998, (24,000 shares which are at the end of or outside the class period) for approximately $532,000); and Koblick sold 82,178 shares on May 8, 1998, for approximately $2.6 million.

. The Reform Act is the 1995 amendment to the Exchange Act.

. The Sixth Circuit has gone so far as to hold that "plaintiffs are entitled only to the most plausible of competing inferences.” See Helwig v. Vencor, Inc., 251 F.3d 540, 553 (6th Cir.2001). Although our opinion in Green Tree cited the Sixth Circuit's decision in Helwig, Green Tree, 270 F.3d at 661, we do not believe that Green Tree adopted Helwig’s statement about "the most plausible of competing inferences” as the law of this Circuit.

. The Reform Act outlines the pleading requirements for a claim based upon misleading statements and omissions as follows:
In any private action arising under this chapter in which the plaintiff alleges that the defendant—
(A) made an untrue statement of a material fact; or
(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
See 15 U.S.C. § 78u-4(b)(1).

. Notably, after the occurrence of the facts giving rise to this lawsuit, the NASD passed rules which require disclosure of the receipt of a delisting letter within seven calendar days or face a trading halt. Association of Securities Dealers, Inc., NASD Manual Marketplace Rule 4815(b) and Nasdaq Stock Market Section IM-4120-2 (Nov.2000) available at http://secure.nasdr.com.