## In re NASH FINCH CO. SECURITIES LITIGATION

**This document relates to: All Actions**

**No. 02–CV–4736(JMR/RLE).**

United States District Court,
D. Minnesota.

June 14, 2004.

---

Christopher P. Seefer, Connie M. Cheung, Reed R. Kathrein, Lerach Coughlin Stoia & Robbins, San Francisco, CA, Darren J. Robbins, Randall H. Steinmeyer, William S. Lerach, Lerach Coughlin Stoia & Robbins, San Diego, CA, Garrett D. Blanchfield, Jr., Reinhardt Wendorf & Blanchfield, St Paul, MN, Paul J. Geller, Geller Rudman, Boca Raton, FL, Vernon Jay Vander Weide, Head Seifert & Vander Weide, Mpls, MN, for Plaintiffs.

Andrew S. Hansen, Bret A. Puls, Heidi A. O. Fisher, Michael J. Bleck, Oppenheimer Wolff & Donnelly, Mpls, MN, for Defendants.

## ORDER

ROSENBAUM, Chief Judge.

Defendants move to dismiss this consolidated class action pursuant to the Private Securities Litigation Reform Act of 1995 and Rule 12(b)(6) of the Federal Rules of Civil Procedure. The putative plaintiffs seek to represent persons and entities that purchased stock in Nash Finch Company, a food distributor and retailer, between February 23, 2000, and February 4, 2003, claiming Nash Finch and three of its senior officers committed securities fraud, as defined by §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder.

For the reasons set forth below, defendants' motion is granted, and the case is hereby dismissed.

### I. The Allegations

#### a. The Count–Recount Program

Plaintiffs allege defendants inflated Nash Finch's earnings in violation of securities laws by improperly accounting for a sales promotion known as the count-recount program ("the CRC program"). Under the CRC program, vendors gave Nash Finch rebates based on the quantity of their products sold during specified periods.

Nash Finch incurred costs as it tracked these sales. To recoup these costs, it typically charged vendors an administration fee. Prior to November 17, 2002, Nash Finch had two methods of charging this fee. Under the first method, the fee was separately identified on the invoice sent to vendors. Under the second method, Nash Finch self-assessed the fee by increasing the stated quantity of goods sold on the invoice, thereby increasing the amount of the CRC rebate. Plaintiffs' strenuous objection to the second method is the gravamen of their complaint.

Beginning in October, 2002, the Securities and Exchange Commission ("SEC") investigated Nash Finch's method of assessing the CRC fee. During the investigation, Nash Finch met with its vendors and reviewed complaints about the fee. Plaintiffs claim Nash Finch "was constantly settling these disputes by paying ven-

dors the disputed amounts."[1] (Compl. at ¶ 46.) After these meetings, Nash Finch uniformly assessed its administration fee as a separate invoice item. The SEC concluded its formal inquiry on March 7, 2003, finding no objection to Nash Finch's method of recouping the administrative fee.[2]

Plaintiffs claim Nash Finch's method of assessing the fee violated Generally Accepted Accounting Principals ("GAAP") by artificially reducing the company's cost of goods sold during the CRC promotional periods. Thus, they allege overstated earnings of $1.14 million in 2000, $1.98 million in 2001, and $1.54 million in 2002.

### b. The "Big Bath"

In 1998, Nash Finch claimed approximately $34 million in restructuring charges based on the company's plan to close three distribution warehouses and discontinue operations at one of its subsidiaries. In 1999, the company reversed $11.6 million of these charges after deciding to defer closing two of the warehouses and selling the subsidiary at a net gain. Plaintiffs claim the only reason defendants took the 1998 charges was to allow their reversal in 1999. Plaintiffs call this the "big bath." According to plaintiffs, these actions allowed Nash Finch to overstate its 1999 profits in violation of GAAP and securities laws.

### c. The Haedicke Allegations

John Haedicke, former Chief Financial Officer of Nash Finch, filed an entirely unrelated employment lawsuit against the company in 2000.[3] One of the allegations in this suit was that defendant Ron Marshall, the Chief Executive Officer at Nash Finch, directed Haedicke to take an improper $2.4 million accrual in violation of GAAP. Haedicke claims he refused to do so. Regardless of the accuracy of Mr. Haedicke's claim, the accrual was never taken.

According to Haedicke, he discovered other accounting problems which occurred at lower levels in the company and brought them to the attention of his supervisors. If any accounting issues existed at that time, they were apparently corrected, because Haedicke admitted that "the completed financial statements necessarily did not contain" the errors and misrepresentations he claimed to have uncovered. (2nd Hansen Aff., Ex. M at 16.) Plaintiffs rely heavily upon these allegations in order to bolster their claim of GAAP violations, and to insinuate that Nash Finch exhibited a propensity to manipulate financial reports.

Plaintiffs further allege Nash Finch misrepresented the circumstances under which Haedicke left the company. According to plaintiffs, Nash Finch issued a press release stating Haedicke left the company to pursue other areas of interest, when in fact he was fired. They claim this, too, was a material misrepresentation in violation of securities law.

### d. The USDA Investigation

Plaintiffs have also unearthed a 1999 investigation of Nash Finch's North Carolina distribution plant. The United States Department of Agriculture

---

**1.** Nash Finch denies this allegation, but the Court considers the facts in favor of the putative class plaintiffs.

**2.** Nash Finch's auditor at the time, Deloitte & Touche, resigned during the investigation, stating Nash Finch was unable to provide it with sufficient information to conclude that the accounting practices were proper. Nash Finch, thereafter, engaged Ernst & Young, which certified its 2002 financial statements. Nash Finch did not restate its earnings or relevant financial results for 2002, or any other relevant year, nor has it been asked to do so by its auditors or the SEC.

**3.** This lawsuit was resolved in 2001.

("USDA") investigated the North Carolina facility and found that the company had engaged in practices which allowed articles capable of use as human food to become exposed to dust, dirt, and unsanitary conditions. The USDA investigation led to an October, 2001, misdemeanor charge and subsequent guilty plea, resulting in a sentence of probation and a $100,000 fine. All of this was disclosed in Nash Finch's 2002 10–K filing with the SEC.

During this investigation, Nash Finch's financial reports stated that its distribution warehouses were operating efficiently and contributing to the company's overall profitability. Plaintiffs claim the company's guilty plea renders these assertions false and misleading in violation of securities law. Plaintiffs also contend defendants omitted material information from their financial reports by failing to timely disclose the government's lawsuit and guilty plea.

### e. *GAAP Compliance*

Plaintiffs claim Nash Finch's financial reports consistently represented that the company complied with GAAP. (*See, e.g.,* Compl. at ¶ 90.) Plaintiffs allege these representations were false, because they claim Nash Finch violated GAAP in all of the ways detailed above. Thus, plaintiffs allege the GAAP violations led to securities fraud violations.

### f. *Delayed Financial Results*

. Finally, plaintiffs claim defendants lied about the reason Nash Finch delayed its third-quarter 2002 ("3Q02") financial results. Plaintiffs allege Nash Finch used the financial press to suggest it was postponing disclosure of its 3Q02 financial reports because its new auditors were "not yet up to speed." [4] (Compl. at ¶¶ 132–34.) In fact, plaintiffs contend Nash Finch post-

poned the results because of the SEC's pending investigation into the CRC program.

## II. *Discussion*

In order to sustain a securities fraud claim under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder, the plaintiffs must show:

(1) misrepresentations or omissions of material fact or acts that operated as a fraud or deceit in violation of the rule; (2) causation, often analyzed in terms of materiality and reliance; (3) scienter on the part of the defendants; and (4) economic harm caused by the fraudulent activity occurring in connection with the purchase and sale of a security.

*In re K–tel Int'l, Inc., Sec. Litig.,* 300 F.3d 881, 888 (8th Cir.2002).

In enacting the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Congress raised the previously-established standard for surviving a Rule 12(b)(6) motion in private securities cases. *See Florida State Bd. of Admin. v. Green Tree Fin. Corp.,* 270 F.3d 645, 660–61 (8th Cir.2001). The PSLRA established a new, stricter standard in order to establish scienter. Under the Act, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Thus, while a court ordinarily—and previously—assumed a complaint's factual allegations to be true, the PSLRA requires a court to disregard catch-all or blanket assertions of scienter. *Green Tree,* 270 F.3d at 660. Going further, while plaintiffs are ordinarily entitled to all reasonable inferences drawn from allegations in a complaint, under the

---

**4.** Nash Finch gave no reason for the delay. Plaintiffs, however, claim the company used the financial press as a conduit for the false representations.

PSLRA, securities fraud cases cannot survive unless the complaint's allegations lead to a strong inference of the required state of mind. *Id.* In short, "inferences of scienter survive a motion to dismiss only if they are both reasonable and 'strong.'" *Id.*

Defendants assert plaintiffs' scienter allegations do not pass this strict test. The Court agrees. As a result, they have failed to state a claim under Rule 12 and the PSLRA. Furthermore, the Court recognizes that plaintiffs' Section 20(a) claim is simply derivative of their defective Section 10(b) claim. As such, it too must be dismissed. *See Deviries v. Prudential–Bache Sec., Inc.,* 805 F.2d 326, 329 (8th Cir.1986).

### a. *Scienter*

Under the PSLRA, "scienter" encompasses "the intent to deceive, manipulate, or defraud." *Green Tree,* 270 F.3d at 653. This intent may be established by producing evidence of "knowing or intentional practices to deceive, manipulate, or defraud." *Alpern v. UtiliCorp United, Inc.,* 84 F.3d 1525, 1534 (8th Cir.1996). Evidence of conduct "ris[ing] to the level of severe recklessness may [also] be sufficient to meet the scienter requirement." *K–tel,* 300 F.3d at 893. Finally, evidence of motive and opportunity to defraud can also be relevant to the scienter analysis. *Id.* at 894. Here, plaintiffs have failed to establish scienter because they have not shown defendants acted either knowingly or recklessly, and the motives they ascribe to defendants are not probative of scienter.

### 1. *Not Knowing or Severely Reckless*

Plaintiffs have failed to plead facts which support a finding that defendants acted

knowingly, intentionally, or with severe recklessness concerning any of the alleged fraudulent practices. The Court makes this finding, despite plaintiffs' grab-bag[5] allegations detailed above.

Plaintiffs claim they have established the requisite knowledge or recklessness in the following three ways: (1) defendants "admitted" they knew about the fraud; (2) defendants' high-rank in the company makes them officers who "received reports and attended meetings" discussing the CRC program; and (3) defendants' GAAP violations show severe recklessness. Each argument is unavailing.

### A. *The "They Admitted It" Theory*

Plaintiffs claim defendants admitted knowledge of a fraud. But a facial review of defendants' pleadings reveals no such admission, and they do not otherwise acknowledge participation in, or knowledge of, any fraud. So the Court will attempt to follow the thread of plaintiffs' argument.

Plaintiffs construct their syllogism as follows: Nash Finch admitted to accounting for its rebate costs as it did. Plaintiffs claim Nash Finch's accounting mechanism was fraudulent. Nash Finch has therefore admitted a fraud.

█ This syllogism is flawed. Plaintiffs' claim that the method of charging the administrative fees was fraudulent is not at all self-authenticating. The argument rests on plaintiffs' assertion that Nash Finch admitted in several SEC submissions "that it purposely overcharged its vendors ... by overstating the amount of product that was actually sold." (Compl. at ¶ 148.)

---

**5.** Plaintiffs make no attempt to prove scienter for the Big Bath claim, the Haedicke claim, the USDA claim, the GAAP compliance claim, or the delayed 3Q02 financial results claim. Nor do they argue that these make-weights actually show scienter concerning the asserted CRC wrongs. It seems they have offered this laundry list of inconsequentialities merely to show that defendants are not very nice.

A plain reading of those filings shows no such thing. The filings do not admit that the practices were fraudulent; they merely describe Nash Finch's occasional practice of realizing the CRC administrative fee by showing an increased quantity of goods sold rather than by charging the fee as a separate invoice item. Nash Finch's filings explicitly defend the propriety of the practice: "We believe that our efforts to recapture count-recount costs by adding additional cases to the invoices in lieu of a separately delineated administrative fee were appropriate." (2002 Form 10–K at 8.)

The Court therefore does not credit plaintiffs' overblown argument that defendants' statements constitute an admission of an intent to deceive, manipulate, or defraud.

### B. *No Imputed Scienter*

Plaintiffs next suggest scienter can be imputed to defendants based on their important positions at Nash Finch and their attendance at meetings where the CRC program was discussed. Defendants were, in fact, "high-level executives who had access to information" about the CRC program. *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.,* 286 F.Supp.2d 1047, 1062 (D.Minn.2003) (internal quotations omitted). But this proves nothing about fraud or knowledge thereof. Such assertions are "exactly the sort of catch all or blanket assertion the court must disregard under the PSLRA." *Id.* (internal quotations omitted).

■ Plaintiffs do not allege defendants received any specific information supporting an inference that they knew or believed the CRC administrative rebate program was fraudulent. Plaintiffs can only state that Nash Finch had meetings where the CRC program and the administrative fee were discussed, and that the individual defendants attended and received reports of these meetings. This is neither surprising nor indicative of fraud. At best, it simply shows defendants were aware the administrative fee was being assessed as an increase in goods sold. It does not show they had any knowledge of accounting impropriety, or that the program was being used to defraud or overcharge. These allegations are insufficient to support an inference of scienter.

### C. *GAAP Violations*

Plaintiffs repeatedly invoke defendants' accounting practices and their view that these practices violated GAAP. According to plaintiffs, the GAAP violations reflect the severe recklessness required to establish scienter. This claim also fails.

■ It is well established that GAAP violations are insufficient to show severe recklessness or scienter unless accompanied by "evidence of a corresponding fraudulent intent." *In re Navarre Corp. Sec. Litig.,* 299 F.3d 735, 745 (8th Cir.2002) ("Allegations of GAAP violations are insufficient, standing alone, to raise an inference of scienter."). In other words, there must be evidence that the GAAP violations were part of a scheme to deceive, manipulate, or defraud, and plaintiffs have failed to produce this evidence. Ergo, the GAAP allegations are not probative of scienter. *Id.*

### 2. *Motive Allegations are Insufficient*

■ Plaintiffs offer a number of purported company and officer motives to commit the alleged securities fraud. According to plaintiffs, when these motives are taken together, they are sufficient to support an inference of scienter. While motives can be relevant to the scienter analysis, allegations common to all corporate officers are insufficient. *K–Tel,* 300 F.3d at 894. Here, the motives plaintiffs ascribe to these defendants are typical of

virtually all corporate officers, and are entirely insufficient to prove scienter.

### A. *Increased Compensation*

■ According to plaintiffs, defendants' compensation was tied to the company's stock price. Building on this soft base, plaintiffs claim defendants were motivated to overstate the company's earnings in an effort to inflate the share price. Of course, the practice of tying officer compensation to stock price is scarcely unique to Nash Finch. Because it is so common, it is relevant only where the magnitude and timing of the financial benefit is "unusual." *See id.* at 895; *cf. Green Tree,* 270 F.3d at 661 (finding an unusual benefit where defendant was paid over $100 million in a year based upon allegedly overstated earnings). This is not the case here.

■ Plaintiffs attempt to characterize this case as "unusual" by pointing to the temporal relationship between the CRC program and Nash Finch's 1999 change in its executive compensation plan "to strongly link executive compensation to ... income and the value of the Company's stock." (Compl. at ¶ 60.) After this change, CEO Ron Marshall's 2002 total compensation exceeded $3 million, and CFO Robert Dimond's 2002 total compensation exceeded $1 million.[6] Even assuming that the close timing is suspicious, plaintiffs have not shown the compensation benefit to be "unusual" enough to provide a motive to commit fraud.

One or three million dollars is a lot of money, but this is simply not a *Green Tree*-type of "unusual" case. The *Green Tree* defendant made $167 million over the two years his company's earnings were allegedly overstated, making him the highest-paid executive in the country. *Green Tree,* 270 F.3d at 661. This was nearly

twenty times what he received (per year) after the unusual compensation package expired. *Id.* Nothing even remotely close to such an unusual benefit has been alleged here. The Court finds plaintiffs' offer of the compensation package as proof of scienter irrelevant.

### B. *Better Credit, Etc.*

■ Plaintiffs serve up other truisms to suggest motive, including defendants' desire to raise financing, maintain liquidity, remain in compliance with loan covenants, and preserve a favorable credit rating. Each of these "motives" is a business commonplace. Each is shared by legions of corporate officers. Such common business aspirations are insufficient to support a claim of scienter. *See, e.g., id.* at 664 ("The desire to maintain a high credit rating is universally held among corporations and their executives and consequently does not contribute significantly to an inference of scienter.").

Plaintiffs offer the case of *Howard v. Everex Sys., Inc.,* 228 F.3d 1057 (9th Cir. 2000) to bolster these allegations. But plaintiffs' counsel well know that *Howard* was not decided under the PSLRA's heightened pleading standard. *Id.* at 1064 (holding that the heightened pleading requirements of the PSLRA are inapplicable to a motion for summary judgment or a motion for judgment as a matter of law). A later Ninth Circuit Court of Appeals decision makes clear that "what was sufficient to avoid summary judgment in *Howard* is not necessarily sufficient to avoid a motion to dismiss under the PSLRA." *In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1097 (9th Cir.2002). The Court, therefore, cannot find these alleged motives relevant

---

6. Marshall earned $698,629 in 1999; Dimond earned $220,964 in 2000. (Complaint at ¶¶ 18–19.)

to the scienter analysis on a motion to dismiss.

## C.  *The Restructuring Plan*

Nash Finch had a five-year restructuring plan in place when the alleged fraud occurred.  Plaintiffs claim that a desire to make the plan seem successful motivated defendants to overstate the company's earnings, citing *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245 (10th Cir. 2001).  The *City of Philadelphia* court observed that "the desire not to jeopardize a company's business plan is a motive shared by most companies and thus would not ordinarily support an inference of fraudulent intent." *Id.* at 1268.  There, the court suggested that an exception might "arguably" exist in the unusual case where the alleged fraud is "specifically and directly related" to the substance of the business plan.[7] *Id.* This reed will not support plaintiffs' case here.

■ Plaintiffs offer nothing resembling a specific and direct relationship between the alleged fraud and Nash Finch's restructuring plan.  And there is no suggestion the CRC Program was integral to the five-year plan.  Plaintiffs bootstrap the fact that the plan was designed to "improve profitability" and that the CRC Program contributed to the company's profit into proof of scienter.  But "improved profitability" is the *sine qua non* of a motive possessed by all corporate officers.  It is difficult to conceive of any corporate plan which would not have improved profitability as a goal.[8]  Thus, plaintiffs have failed to establish any relationship between the alleged fraud and the business plan—much less a specific and direct one.

### 3.  *Collectively, the Allegations are Insufficient*

Plaintiffs' memorandum candidly admits that their allegations are "not compelling in isolation." (Opp'n at 27–28.)  They remedy this defect by asking the Court to consider the same items in the collective, evoking an agglomerative form of the strong inference of scienter.  *Green Tree* does suggest allegations of scienter may be considered collectively.  *Green Tree*, 270 F.3d at 660.  But, as shown above, each of plaintiffs' proffered scienter allegations is either trivial or irrelevant.  The Court finds the collective minutia offered here adds up to nothing.  Just as two plus two will never equal five, these allegations—whether considered apart or together—do not add up to a strong inference of scienter.[9]

### b.  *The § 20(a) claim*

Plaintiffs' § 20(a) claim depends entirely on the merits of their § 10(b) and Rule 10b–5 claims.  As the Court finds those claims fail for lack of scienter, the § 20(a) claim must also be dismissed.  *E.g. Navarre*, 299 F.3d at 748 ("[B]ecause the investors failed to present an actionable claim under 10(b) or 10b–5, the section 20(a) claim is not actionable.").

## III.  *Conclusion*

The Court concludes plaintiffs have failed to plead facts giving rise to a strong

---

7.  A specific and direct relationship arguably existed in *City of Philadelphia*.  A major premise of plaintiffs' case was that the company failed to disclose a lawsuit challenging its ability to carry out its business plan. *Id.* at 1268–69.  That court, even after finding a motive to preserve its business plan "somewhat probative," still found plaintiffs had failed to adequately plead scienter. *Id.*

8.  A business plan designed to "reduce corporate profits" beggars the imagination.

9.  *Cf.* Billy Preston, "Nothing From Nothing" (A & M Records 1974) ("Nothin' from nothin' leaves nothin'/ You gotta have something'...").

inference of scienter. For that reason, the complaint fails to state a claim upon which relief may be granted under the pleading requirements of the PSLRA. Plaintiffs request leave to amend the complaint, but there is no reasonable basis upon which to conclude that this complaint's defects can be cured. Accordingly, it would be futile to grant leave to amend. The complaint is therefore dismissed with prejudice. *See K–Tel,* 300 F.3d at 899.

For all of the foregoing reasons, IT IS ORDERED THAT:

Defendants' motion to dismiss the complaint [Docket No. 30] is granted. Plaintiff's complaint is dismissed with prejudice.

LET JUDGMENT BE ENTERED ACCORDINGLY.